FAIRLY v. WAPPOO MILLS.

1. MOTION TO STRIKE OUT ANSWER—DEMURRER.—A motion made at the hearing to strike out the defences set up in the answer, is practically a demurrer to the answer, on the ground that it does not state facts sufficient to constitute a defence, and so considered.

2. EVIDENCE—CUSTOM.—Evidence of custom and usage is not admissible to explain or vary the terms of an express contract, whether written or verbal, unambiguous in its terms, unless it be to show the meaning of certain terms used in such contract which, by well established custom or long usage, have acquired a meaning different from that which they primarily bear.

3. IBID.—IBID.—BROKER'S COMMISSIONS.—Where there is a written contract for the sale of 2,000 tons dissolved bones in bulk f. o. b. cars at place of shipment, for $9.85 per ton of 2,000 pounds, to be shipped in lots of 400 tons in each of five consecutive months named, on the terms of sight draft against the bills of lading, the seller to pay brokerage of ten cents per ton, parol testimony cannot be received to show a custom or usage to explain for what amount of tons broker's commissions were chargeable, as the contract is unambiguous as to that matter.

4. BROKER'S COMMISSIONS—CHANGE IN CONTRACT.—The plaintiff's right to commissions as broker cannot be affected by a change in the contract subsequently made by the seller with the purchaser, acting through plaintiff as agent of the purchaser, and not in his former capacity of broker.

5. ALLEGATION OF ANSWER—INSOLVENCY.—An allegation in the answer, that the purchaser was not able to pay one of the drafts at the time of its presentation for payment, is not an allegation of his inability to pay for the goods purchased, nor of his insolvency.

6. BROKER'S COMMISSIONS—ABILITY OF BUYER.—A broker is entitled to his stipulated commissions on a sale of fertilizers when he can show that the purchaser found by him was ready and able to comply with the sale made through him; and also where the terms of sale have been confirmed by the seller, and where the purchaser treated with is accepted by the seller without any misrepresentation or suppression of the truth by the broker, he is entitled to his commissions, unless the seller can show that the purchaser could not comply.

7. LICENSE ORDINANCE—NON-PAYMENT OF LICENSE.—An ordinance of city council, passed in pursuance of legislative authority, requiring a license fee for carrying on the business of a broker, does not render void a contract made by an unlicensed broker, where the ordinance does not expressly or by manifest intent declare the business unlawful without license; and the ordinance in this case did not so expressly declare, and no such intent was manifest; but, on the contrary, its purpose was only to raise revenue, as is shown by the penalty for an unlicensed business being imposed only upon the person of the broker, and the time for payment of the fee being fixed at a date subsequent to the commencement of the term for which payable.[1]

8. PETITION FOR REHEARING refused.

Before TOWNSEND, J., Charleston, March, 1894.

Action by John S. Fairly against Wappoo Mills. The complaint was as follows:

The plaintiff, complaining of the defendant, alleges as follows: *First.* That the plaintiff is a broker in the city of Charleston, State of South Carolina, carrying on a brokerage business in fertilizers, phosphate rock, and similar products, and was so at the times hereinafter mentioned; and that the defendant, Wappoo Mills, was at the times hereinafter mentioned, and now is, a corporation created by and under the laws of the State of South Carolina, and having its principal office and place of business in the county of Berkeley. *Second.* That the plaintiff, as such broker, sold for account of said defendant, on June

---

[1] The effect of a failure to procure license for a business on the validity of a contract made therein is the subject of annotation to Buckley *v.* Humason (Minn.), 16 L. R. A., 423.—REPORTER.

5th, 1890, 2,000 tons dissolved bone to the Caddo Fertilizer Co., the brokerage on which, at the accustomed rate agreed upon, was $200, and was to be paid by the defendant. That the plaintiff has received from the defendant sixty-eight dollars on account of said brokerage, but the balance of $132 is still due and unpaid, although demanded of the defendant. All of which will more fully appear, on reference to the broker's memorandum of sale, bill, and account, heretofore rendered defendant, and copies of which are hereto annexed, as exhibits A, B. C, and made part of this complaint. *Wherefore* the plaintiff demands judgment against the defendant, in the sum of $132 and costs.    Verified.

EXHIBIT A.—Charleston, S. C., June 5th, 1890. Sold for account of "Wappoo Mills," of Charleston, S. C., to the "Caddo Fertilizer Co.," of Shreveport, La., (2,000) two thousand tons dissolved bone, guaranteed minimum analysis, (13½) thirteen and one-half per centum available phosphoric acid, in bulk, f. o. b. cars here, at ($9.85) nine and 85–100 dollars per ton of 2,000 pounds.    Terms: Sight draft against B–L.    Shipments: Four hundred tons per month, during September, October, November, and December, 1890, and January, 1891.    Seller paying brokerage at ten cents per ton.    Accepted.    (Fire, storm, and other unforeseen events excepted.)    (Signed) Wappoo Mills, C. C. Pinckney, jr., president.    Accepted.    (Signed) Caddo Fertilizer Co.

The answer was as follows:

The defendant, the Wappoo Mills, answering the complaint herein, for a first defence, says: 1. That it admits the allegations made in the first paragraph of the complaint herein.    2. That it denies each and every allegation of the second paragraph, except as is specifically admitted in this paragraph.    3. This defendant admits that the contract of sale attached to the complaint as exhibit "A," and made a part thereof, was brought about by the plaintiff, but this defendant alleges that there existed at the date thereof a custom in this business, to pay brokerage or commission only on the amount of stuff actually sold and delivered under such contract.

For a second defence, this defendant alleges: 1. That some time in the early part of the year 1890, the plaintiff, representing the Caddo Fertilizer Company, offered to purchase from the defendant for said company, 2,000 tons of dissolved bone; that the defendant agreed to sell the said 2,000 tons dissolved bone to the Caddo Fertilizer Company upon the following terms and no other, that is to say, for the price of $9.85 per ton of 2,000 lbs., f. o. b. cars Charleston; terms, sight draft against bill of lading; shipments, 400 tons per month during September, October, November, and December, 1890, and January, 1891; seller paying brokerage at 10c. per ton; fire, storm, and other unforeseen events excepted. 2. That about the time designated for the first shipment of 400 tons of dissolved bone, the plaintiff, still representing the Caddo Fertilizer Company, requested the defendant not to ship the said 400 tons, which, according to the terms of sale, ought to have been shipped at that time. 3. That about the time designated for the second shipment of 400 tons, the plaintiff, still representing the Caddo Fertilizer Company, requested the defendant not to ship said 400 tons, which ought to have been shipped at that time. 4. That about the time designated for the third shipment of 400 tons, viz: some time in November, 1890, the plaintiff, still representing the Caddo Fertilizer Company, requested the defendant to ship to the Caddo Fertilizer Company a cargo of dissolved bone, by vessel, for the price of $9.50 per ton, f. o. b. vessel; that the defendant shipped by vessel 684.21 tons dissolved bone to said company, drawing upon them at the request of the plaintiff at thirty days for the purchase money for same. 5. That when the said draft became due and payable, the plaintiff, still representing the Caddo Fertilizer Company, urged the defendant to renew and extend the said draft for sixty days longer, for the reason that the Caddo Fertilizer Company were not able to pay the first draft at that time; that this defendant having negotiated said first draft, was compelled to take up same and accept the note of the Caddo Fertilizer Company, payable at sixty days. 6. That shortly after the failure of the Caddo Fertilizer Company to pay the said first draft, the plaintiff, still representing the said Caddo Fertilizer Company, re-

quested the defendant to send another shipment of dissolved
bone to said company, but this defendant, considering the said
agreement of sale broken, by reason of the several breaches
hereinabove mentioned, refused to make the desired shipment.
7. This defendant, therefore, alleges that the entire amount of
dissolved bone sold by it to the Caddo Fertilizer Company, as
above set forth, is 684.21 tons, and admits that the plaintiff
herein became entitled to a brokerage thereon of $68.43. But
this defendant further alleges that of this brokerage the sum
of sixty-eight dollars have already been paid to the said plain-
tiff at his request, and that there remains due to the said
plaintiff on the said transaction, the sum of forty-three cents,
which said sum of forty-three cents this defendant has always
been willing and is now willing to pay.

For a third defence to the alleged cause of action, this de-
fendant alleges: 1. That in pursuance of the power in them
vested by an act of the General Assembly, passed December
17th, 1881, and entitled "An act to authorize the city council
of Charleston to impose a license tax on all persons engaged in
any business, trade or profession in the city of Charleston," the
city council of Charleston, on the 23d day of December, A. D.
1889, enacted a law, entitled "An ordinance to regulate licenses
for the year 1890," requiring all persons, firms, or corporations
engaged in or intending to engage in any trade, business or
profession therein mentioned, to obtain before January 20th,
1890, a license therefor, and imposing a penalty for each offence
on those who should carry on such business, trade or profession,
without first taking out the required license. 2. That the
plaintiff herein, the said John S. Fairley, failed to obtain,
during the year 1890, the proper license prescribed by said
ordinance for the business conducted by him.

The ordinance referred to in the above answer was as follows:
An ordinance to regulate licenses for the year 1890. Section
1. Be it ordained by the mayor and aldermen of the city of
Charleston, in city council assembled: That every person, firm,
company or corporation engaged in, or intending to engage in,
any trade, business or profession hereinafter mentioned, shall

obtain *on or before the .20th day of January*, A. D. 1890, a license therefor, in the manner hereinafter prescribed.   Every person, firm, company or corporation commencing business after the said 20th day of January, A. D. 1890, shall obtain a license therefor before entering upon such trade, business or profession.   *   *   *   Section 3.  If any person or persons shall exercise or carry on any trade, business or profession, for the exercising, carrying on or doing of which a license is required by this ordinance, without taking out such license as in that behalf required, he, she or they shall, for each and every of-fence, be subject to a penalty not exceeding $100, as may be adjudged by the recorder or court trying the case.   And the same shall be entered up as a judgment of the court, and exe-cution shall issue against the property of the defendants, as for the collection of other taxes and penalties.  Section 4.  *  *  * It shall be the duty of the city sheriff, the police, and his dep-uties, to detect and report all parties failing to take out a license as herein required.   They shall visit each and every place of business *after the 20th day of January, 1890*, and ascertain and report at the following regular meeting of council, the names and places of business of all persons failing to take out a li-cense.   *   *   *   Section 7.  All licenses granted under this ordinance shall continue in force *until the 31st day of December, A. D. 1890.*   No license except such as is provided for by lim-itation, per diem or month, or by amount of sales, shall be issued *for less time or rate than one year.*   The city treasurer shall prepare a proper form to be issued in each case.  *  *  * Section 13.  That the charge for license for any business, trade or profession not enumerated above shall be determined on by the committee on ways and means and the city treasurer con-jointly.  *  *  *  Class 5.   1.  Brokers, pawn, each, $300.   2. Brokers, stock and other personal property and real estate at private sale, each, $75.   3. Brokers, ship, $50.   4. Brokers, street, $50.

The judgment on the demurrer to this answer was as follows:

In June, 1890, John S. Fairly, a broker, doing business in Charleston, S. C., sold for Wappoo Mills, a South Carolina

corporation, having its office and chief place of business in Berkeley County, 2,000 tons of dissolved bone to the Caddo Fertilizer Company, of Shreveport, La. The copy of the broker's contract, made a part of the complaint, shows that the sale was "for account of Wappoo Mills," and that the "seller paying brokerage at ten cents per ton." Fairly sent in his bill for $200 brokerage, as per the memorandum of sale, but the defendant would only pay $68, disputing the balance. The plaintiff then sued for the balance, $132, and to the complaint the defendant filed a lengthy answer. Plaintiff's counsel gave written notice, that on the trial they would move to strike out the respective defences (first, second, and third) of the answer, on the ground that they did not constitute grounds of defence or counter-claim; and that they would ask for judgment by default if all the defences were so stricken out. Code, § 174; *Mobley* v. *Cureton*, 6 S. C., 69. The demurrer came on to be heard at the trial; and the simple question is, admitting the truth of all the facts set out in the answer, do they constitute any valid defence or counter-claim to the plaintiff's claim for brokerage? No counter-claim is set up, so that we are only to deal with defences.

Three defences are set up: The answer admits that the broker made the contract sued on, but states that, *first*, there is a custom in the fertilizer trade by which brokerage is only allowed on such stuff as is actually delivered on the contract; *second*, that only 680 tons were delivered, as the terms of the contract were subsequently modified by the parties; and, *thirdly*, Fairly had no license, as required by the license ordinance of the city of Charleston for the year 1890, and, therefore, the contract he made was unlawful, illegal, and void, and he could not sue for and recover his brokerage for making it. If the making of the original contract is admitted, as it is in the answer, then none of these defences are good, even if they are all true.

*First.* As to the license, which seems the most serious question. It is admitted, that if the law requiring a license or other regulation of this character, actually and in terms declares, that the act or calling is unlawful unless and until the license or requirement is complied with, then the act or calling

is prohibited, and a contract made under it cannot be sued on.
If, however, there is no express and specific prohibition, then
it is necessary to construe the act or ordinance and see if the
intent is to prohibit.    2 Ben. Sales, 526; *Harris* v. *Runnels*, 12
How., 84; 12 Am. & Eng. Enc. L., 516.    Now, one of the lead-
ing canons of construction in cases of this sort is the test,
whether or not the license or exaction is a police regulation,
or "a tax assessment for the security and collection of the rev-
enue."    If the former, the calling itself is invalid, unless the
requirement is complied with; but if it is a "tax for revenue,"
then the act done is valid.    The law does not operate on the
business or calling, and affect that, but on the person, and pun-
ishes him with penalty or otherwise.    *McConnell* v. *Kitchens*,
20 S. C., 436; 2 Ben. Sales, § 825; *Harris* v. *Runnells*, 12 How.,
84; *In re Jager*, 29 S. C., 445.    Under such license and tax
laws for "revenue," in cases almost identical with the present,
the contract has been held valid, and the parties entitled to
enforce it, and the agent to demand compensation for making
it.    *Ames* v. *Gilman,* 51 Mass., 243; *Larned* v. *Andrews,* 106
*Id.,* 436; *Mandelbaum* v. *Gregovitch,* 28 Pac. Rep., 121; and cases
last cited above.

If these be the laws of construction, then what is the character
of the Charleston license ordinance of 1890?   It is not pretended
that it contains any provision that business conducted without
license shall be illegal and unlawful until and unless a license
is obtained.    And, as a matter of fact, it contains no such pro-
vision.    But the defendant contends it should be so construed.
Now the ordinance of 1890 is stated in the answer to have been
passed in pursuance of a power vested in the city of Charleston
by the act of the General Assembly, passed December 17, 1881,
entitled "An act to authorize the city council of Charleston to
impose a license tax on all persons engaged in any business,
trade or profession in the city of Charleston."    17 Stat., 582.
The ordinance obtains its authority from, and is limited in its
scope and intention by, the act.    Without the act, or beyond
the scope of the act, the ordinance is void.    *Charleston* v. *Oliver*,
16 S. C., 53.    Now does this act and ordinance intend to pro-
hibit the business or calling, or is it an act and ordinance for

"raising a city revenue?" We are left in no doubt as to this. In a whole series of cases affecting this very question and ordinance, and others similar to it, the courts of South Carolina have held, after argument on argument, that this was a tax for the purpose of raising revenue. *State* v. *Hayne*, 4 S. C., 403; *State* v. *Columbia*, 6 *Id.*, 1; *Charleston* v. *Oliver*, 16 S. C., 50, and 21 *Id.*, 325; *In re Jager*, 29 *Id.*, 444. If, then, this be the construction placed on the ordinance by the highest court of the State, and it is a "revenue tax," the case comes distinctly under the principle of construction already pointed out, and the business is not unlawful without the license.

The defendant contended, that as there was a recurring penalty in the ordinance, this showed the calling was prohibited. This, of course, is also another test adopted to ascertain the meaning of the ordinance. But this yields to the other rule as to the "revenue" character of the act and ordinance, so often declared by the Supreme Court, and need not be considered. But one clause of the ordinance itself is conclusive of this question. The defendant contends that the intention of the ordinance is as if it read: "It shall be unlawful to engage in business unless and until a license is obtained." Now, the ordinance grants a license for the year 1890. The license for 1889 expired December 31st, 1889. Section 1 provides that "all engaged in business * * * shall obtain a license on or before the 20th January, 1890." They are allowed until January 20th to do so. But if the construction of the defendant be adopted, then all of the business transactions in Charleston between January 1st, 1890, and January 20th, 1890, were unlawful, and illegal and void, for the granting of a license afterwards could not cure them. This construction courts could not adopt. The plain meaning of the ordinance is otherwise. It says parties can do business lawfully, but they must pay taxes for revenue. This tax can be paid any time by January 20th, but then after that penalties will be laid on those parties personally who do not pay the tax.

In addition to this, an examination of the contract and pleadings shows the seller, the Wappoo Mills, residing in Berkeley County, and the buyer, the Caddo Fertilizer Company, in Lou-

isiana. The contract cannot be held a Charleston contract because a Charleston broker made it. It is, therefore, not affected by the Charleston ordinance, and is valid, and the broker could sue for his services. In discussing this license matter, it should also be remembered that the direct question here is not between the taxing power and the citizen, but between a broker and a customer, who would avoid the payment for services by pleading the license ordinance of a city not party to the suit. The words of Chief Justice Shaw, in *Ames* v. *Gilman*, 51 Mass., 243, are singularly apposite here: "Whatever other disabilities a person may incur who attempts to practice law irregularly, * * * we think he does not so violate any express provision of statute as to enable one who has employed him, and had the benefit of his services, to refuse paying him a reasonable compensation."

The other questions of custom and change of contract require much less discussion. So far as the custom is concerned, the rule of law is, that where there is a written contract unambiguous in its terms, custom and usage cannot vary it. Clarke's Browne's Usages and Customs, 163, 164, 169; Edwards on Factors and Brokers, 149. Usage cannot control the clear and unequivocal stipulations of a contract, but will be controlled by them. Clarke's Usages, 164; *Globe Milling Co.* v. *Elevator Co.*, 46 N. W., 306. Now the parties here bound themselves by a plain, written contract, in which the plaintiff as broker sold "for account of the Wappoo Mills" 2,000 tons of dissolved bone, for which his compensation is to be, in the language of the contract, "seller paying brokerage at ten cents per ton." This is clear and unambiguous, and no custom could vary it and no evidence as to such custom allowed to control it. The plaintiff cites cases directly in point in which the very question is considered, and the custom not allowed to change the contract and rule of law. *Mordecai* v. *Jacobi*, 12 Rich., 548; *Bower* v. *Jones*, 8 Bing., 65; *Ware* v. *Hayward Rub. Co.*, 85 Mass., 85; *Higgins* v. *Moore*, 34 N. Y., 425; *Paulson* v. *Dalleytt*, 2 Daly, 40; *Cook* v. *Fiske*, 78 Mass., 491. Even if there was a custom, the parties gave the strongest evidence of departing from it by a contract in writing directly in the teeth of it, by its very terms.

.The last defence is that the principals afterwards varied the contract, and finally that the defendant declined to ship the entire 2,000 tons to the Caddo Company for some reasons set out in the answer.   And that the broker acted for the Caddo Company when the changes were made.   An inspection of the pleading will show that the changes were the act and agreement of the principals themselves, and to suit their mutual convenience.   The changes referred to were shipping by boat instead of cars, and a slight change of price to meet this variance, and some modification as to the time of shipment and mode of payment.   But the principals agreed to this themselves, and the contract in the two particulars affecting the broker is not pretended to have been altered.   The number of tons bought and sold was still 2,000, and the seller was still to pay the broker ten cents per ton.   None of the changes, therefore, affected him.   It was also contended that the Caddo Company did not pay one draft at maturity, but arranged an extension with the seller.   And, therefore, it was argued that the Caddo Company could not complete the contract.   The pleading does not show that they could not complete it.   And even if it did, the broker is not responsible for that.   Cases were cited to show that the broker must bring a customer not only willing but able to complete the contract.   But this rule refers only to real estate, where specific performance is the remedy, and not uniformly held even as to real estate, the courts being divided.   But as to personal property, where the breach of the contract sounds in damages, it has never been followed.   There is, therefore, nothing in subsequent changes which is shown could have affected the broker's compensation.   But with all the subsequent modifications, and non-performance or otherwise, the broker has nothing to do at all, in the absence of fraud and bad faith on his part.   And this is nowhere alleged.

What are the duties and business of a broker, and the law as to it?   "A broker for sale is a mere negotiator or middle man between the seller and purchaser."   2 Am. & Eng. Enc. L., 571; *Higgins* v. *Moore,* 34 N. Y., 424; *Vinton* v. *Baldwin,* 45 Am. Rep., 448.   His duty is ended when he brings the parties together, and furnishes a purchaser; he is then entitled to his

commissions, whether the property is actually delivered and the money paid or not. Edwards' Factors and Brokers, p. 148; *Higgins* v. *Moore*, 34 N. Y., 424; note to *Walker* v. *Osgood*, 93 Am. Dec., 177; 2 Am. & Eng. Enc. L., 578, and notes and cases. Where he effects a contract binding on both parties, and which may be enforced, his brokerage is earned, even if the contract be not carried out; this is no concern of his. See authorities cited above; 2 Am. & Eng. Enc. Law, 580, 581. This law is recognized in every court, including the United States Supreme Court. In 2 Am. & Eng. Enc. L., 580, and cases, it is summarized thus: "Where a broker has bound the parties by authorized contract, any inability or refusal of the principal to fulfill the contract he had authorized, should not affect the agent's right to compensation"—citing *Love* v. *Miller*, and numerous other cases. Among all these cases agreeing on this subject, the following are directly in point, and control the present discussion: *Love* v. *Miller*, 21 Am. Rep., 192; *Vinton* v. *Baldwin*, 45 *Id.*, 447; *Cook* v. *Fiske*, 78 Mass., 493; *Paulson* v. *Dallyett*, 2 Daly, 40. The plaintiff brought the parties together by a valid contract; he did his whole duty, and in the absence of fraud or improper conduct, earned his brokerage. Whether the seller and buyer afterwards changed the contract in some particulars, or whether one of them, the defendant in this case, saw fit to decline to complete the same for reasons stated in his answer, is no concern of the broker. He made the contract his principals wanted, and for which the defendant agreed to pay, and should have his compensation.

Thus carefully considered, the answer, even if admitted to be true, really shows no valid defence, nor counter-claim to the plaintiff's suit. All of its three defences are without merit on their face, and should, therefore, be stricken out. This being so, the plaintiff should be allowed to have judgment by default for his claim, to wit: $132 and costs.

The defendant appealed on the following grounds: *First.* Because the presiding judge erred in holding that the answer of the defendant contained no defence to the action. *Second.* Because the presiding judge erred in striking out the first defence

contained in the said answer, and in holding that no custom can vary the contract set out in the complaint herein, and that no evidence as to a custom which would vary the said contract can be allowed to control the contract. *Third.* Because the presiding judge erred in striking out so much of the second defence set out in the answer as alleges that the plaintiff himself proposed and brought about changes in the original contract, which resulted.in a reduction of the amount of material sold by the plaintiff, and that he further erred in construing said defence to allege that the said changes were the acts and agreements of the principals themselves, and that they did not affect the plaintiff. *Fourth.* Because the presiding judge erred in striking out so much of the second defence of the answer as alleges that the party for whom the plaintiff purchased was not able to pay for the material according to the terms agreed upon. *Fifth.* Because the presiding judge erred in holding that the rule which requires a broker to produce a customer able, as well as willing, to complete the contract, in order to entitle him to commissions, applies only to contracts for the sale of real estate, and does not apply to contracts for the sale of personal property. *Sixth.* Because the presiding judge erred in striking out from the answer the third defence therein set forth, and in not holding that the plaintiff could not recover commissions in this action in consequence of his failure to take out his license to carry on his business, as required by an ordinance of the city of Charleston, S. C., entitled "An ordinance to regulate licenses for the year 1890." *Seventh.* Because the presiding judge erred in holding that, under the said license ordinance, it was not unlawful for the plaintiff to carry on his business without first obtaining a license under said ordinance. *Eighth.* Because the presiding judge erred in construing the contract set out in the complaint as not made in the city of Charleston, and, therefore, not affected by the said license ordinance, when it is plainly alleged in the pleadings that the said contract was made in the said city of Charleston.

*Messrs. Ficken & Hughes*, for appellant.

*Messrs. Smythe & Lee*, contra.

May 30, 1895. The opinion of the court was delivered by

MR. CHIEF JUSTICE MCIVER. The plaintiff brings this action to recover the amount of his commissions as a broker, agreed upon by special contract, as he claims, upon the amount of a sale of 2,000 tons of a certain fertilizer, negotiated by the plaintiff for the defendant to the Caddo Fertilizer Company, the commissions being ten cents per ton. The defendant, in its answer, admits the allegations contained in the first paragraph of the complaint, which, in substance, are that plaintiff is a broker in the city of Charleston, S. C., carrying on a brokerage business in fertilizers, &c., and that defendant is a duly chartered corporation under the laws of this State, having its office and place of business in the county of Berkeley. Defendant denies each and every allegation in the second paragraph of the complaint except such as is specifically admitted in the answer, to wit: "That the contract of sale attached to the complaint as exhibit A, and made a part thereof, was brought about by the plaintiff; but this defendant alleges that there existed at the date thereof a custom in this business to pay brokerage or commission only on the amount of stuff actually sold and delivered under such contract. The contract of sale thus referred to is a contract for the sale of 2,000 tons of the fertilizer mentioned by defendant to the Caddo Fertilizer Company upon the terms therein mentioned, amongst which were that the fertilizer should be delivered "f. o. b. cars here"— Charleston; and shipment to be made of "four hundred tons per month, during September, October, November, and December, 1890, and January, 1891. Seller paying brokerage at ten cents per ton." This contract is dated "Charleston, S. C., June 5th, 1890," and is signed by the defendant company through its president, and "Accepted. Caddo Fertilizer Co."

The defendant, in its answer, sets up a second defence, alleging that the purchase was made by the plaintiff, "representing the Caddo Fertilizer Company," on the terms above stated; that about the time designated for the first shipment of 400 tons, the plaintiff, still representing the Caddo Fertilizer Company, requested defendant not to make said shipment; that about the time designated for the second shipment, the plaintiff, still

representing the Caddo Fertilizer Co., requested defendant not to make said second shipment; that about the time designated for the third shipment, the plaintiff, still representing the Caddo Fertilizer Co., requested defendant to ship to said company a cargo of the fertilizer, "by vessel, for the price of $9.50 per ton, f. o. b. vessel," and that defendant did ship by vessel 684.21 tons of said fertilizer to the said company, "drawing upon them, at the request of the plaintiff, at thirty days for the purchase money for same; that when this draft became payable, the plaintiff, still representing the Caddo Fertilizer Co., urged the defendant to renew and extend the said draft for sixty days longer, for the reason that the Caddo Fertilizer Co. were not able to pay the first draft at that time," and the defendant having negotiated said draft, was compelled to take up the same, and accept the note of the Caddo Fertilizer Co., payable at sixty days; that shortly after the failure of the Caddo Fertilizer Co. to pay the first draft, the plaintiff, still representing the said company, requested defendant to send them another shipment; but defendant, "considering the said agreement broken by reason of the several breaches hereinabove mentioned, refused to make the desired shipment." The defendant, therefore, alleges that the entire amount of fertilizers sold by it to the Caddo Fertilizer Co. is 684.21 tons, upon which it is admitted defendant became liable to pay the brokerage agreed upon, to wit: the sum of $68.43, all of which has been paid except the sum of forty-three cents, which defendant has always been and is now willing to pay.

For third defence the defendant alleges that the plaintiff never obtained a license as broker for the year 1890, as required by an ordinance of the city council of Charleston. This ordinance was by consent incorporated in the "Case," and is printed in the record, and its terms will hereinafter be more particularly referred to. While we have thus endeavored to state substantially the pleadings, it will be necessary for a more full understanding of the questions involved in this appeal, that the reporter should embrace in his report of the case copies of the complaint with the exhibit thereto, the answer, and the ordinance referred to in the third defence.

16—44

The plaintiff gave notice, that on the trial of the case he would move to strike out the first, second, and third defences set up in the answer, upon the ground that the allegations therein made do not state facts sufficient to constitute either a defence or counter-claim, and also for judgment by default. This motion was heard by his honor, Judge Townsend, who granted this motion, and held that the plaintiff was entitled to judgment by default for the amount of his claim, to wit: the sum of $132. From this judgment defendant appeals on the several grounds set out in the record, which need not be repeated here, as they, together with the decree of the Circuit Judge, should be incorporated in the report of the case.

While the controversy presented by this appeal arose upon the motion to strike out the several defences set up in the answer, it is, practically, nothing more nor less than a demurrer to the answer, and will be so considered. It follows, therefore, that all the facts well pleaded in the answer must be regarded as true, and the general question is, conceding the facts stated in the answer, whether they are sufficient to sustain any one or more of the defences relied upon. Counsel for appellant, in their argument here, while conceding that the answer, in form, sets up but three defences, yet they claim that the answer really sets up four distinct defences, inasmuch as two of them have been somewhat inartistically united together as one. We see no objection to so regarding the answer, and will, therefore, consider the several defences as stated in the argument of counsel for appellant.

The first is thus stated: "That there exists a custom in the fertilizer trade by which brokerage is only allowed on the amount of material actually delivered under a contract, whatever may be the amount named in the contract."

The question raised by this defence has been before the courts of the several States as well as those of England, in very many cases, most of which, we suppose, have been cited by counsel in their elaborate arguments. We have examined all of the cases cited to which we have been able to obtain access, and in the light of these authorities, without undertaking to cite all of them, we propose to consider the question which we

are called upon to decide. It seems to us that the very decided weight of authority is in favor of the proposition, that evidence of custom and usage is not admissible to explain or vary the terms of an express contract, whether written or verbal, unambiguous in its terms, unless it be to show the meaning of certain terms used in such contract, which by well established custom or long usage have acquired a meaning different from that which they primarily bear, for the reason that when parties in making a contract use terms which by usage or custom have acquired a certain meaning, they must, in the absence of any evidence to the contrary, be assumed to have used such terms in such acquired sense.

In the absence of any authority in this State upon this question (for we do not think the case of *Mordecai* v. *Jacobi*, 12 Rich., 548, throws any light upon the question), we are compelled to resort to the authorities elsewhere. In *Globe Milling Co.* v. *Elevator Co.*, 46 N. W. Rep., 306, the question was, whether the title to certain grain sold vested in the vendee. By the terms of the contract of sale, the grain was sold for "cash on delivery," which had not been complied with, but vendee sought to sustain his claim by proof of a custom prevailing in that locality, whereby the title was regarded as having passed when certain things were done, whatever might be the terms of the sale agreed upon by the parties. But the court said: "A local usage cannot be proved to contradict a contract. * * * If by the contract of sale of this wheat, it was for cash on delivery, the usage cannot make it a sale on a credit."

In *Page* v. *Cole*, 120 Mass., 37, the action was to recover damages for the breach of a contract for the sale of a "milk route," and evidence as to the meaning and effect which that term had acquired by usage prevailing in that locality was held competent.

In *Walls* v. *Bailey*, 49 N. Y., 464, the action was to recover the amount due plaintiff for plastering which he had contracted to do at so much per square yard, and it was held competent to prove that the custom was to measure the openings for windows and doors, as well as the solid walls. In that case it was said that "Every legal contract is to be interpreted in accordance

with the intention of the parties, and usage, when it is reasonable, uniform, and well settled, not in opposition to fixed rules of law, *not in contradiction to the express terms of the contract* [italics ours], is deemed to form a part of the contract, and to enter into the intentions of the parties."

In *Hinton* v. *Locke*, 5 Hill (N. Y.), 437, the action was on a contract to pay the plaintiff so much per day for his services, and it was held competent to show that the universal custom in that locality was to count a day as ten hours. Of course, the term "day" could not be regarded as meaning twenty-four hours, and hence it was competent to show how many hours was regarded as a day. In that case, however, Branson, J., in delivering the opinion of the court, expressly disapproves of the case of *Smith* v. *Wilson*, 3 Barn. & Ad., 728, where upon a contract to pay so much a thousand for all the rabbits in a certain warren, it was held competent to show that in that part of the country the custom was to construe the term "thousand" as meaning one hundred dozen or twelve hundred, because he said that would be allowing the custom to contradict the express terms of the contract. His language is: "No usage or custom can be set up for the purpose of controlling the rules of law; nor is such evidence admissible where it contradicts the agreement of the parties."

In *Ware* v. *Heyward Rubber Co.*, 3 Allen, 84, the plaintiff claimed one-half commissions on goods consigned to him for sale, but not sold and turned over to consignor, basing his claim upon a custom prevailing in that locality. *Held*, that evidence of such a custom was incompetent. Chapman, J., in delivering the opinion of the court, used this language: "This being a written and express contract, the evidence offered in respect to the usage of commission merchants to charge one-half commissions when goods consigned to them in the ordinary way for sale are taken back, is not applicable to this case; for an express contract cannot be controlled or varied by usage;" and this was the point upon which the case turned.

In *Ford* v. *Tirrell*, 9 Gray, 401, the action was upon a contract to build an octagonal cellar wall, at eleven cents per foot, and the question was as to the mode of measurement to be

adopted in order to ascertain the amount of work done. The court seems to have held that, as the contract was silent as to the mode of measurement, it was competent to introduce evidence as to the custom or usage in such cases, by which the mode of measurement should be determined, citing 1 Greenl. on Evid., § 292.

In *Barton* v. *McKelway*, 22 N. J., 165, the action was on a written contract for the delivery of a specified number of *morus multicaulis* trees, of not less than one foot in height, and the question was as to the mode of measuring the height of the trees. *Held*, that it was competent to show that it was the universal custom prevailing amongst dealers in such articles, to measure only the ripe, hard wood, rejecting the green, immature top. The court, in its opinion, say that the true office of such evidence is "to interpret the otherwise indeterminate intention of the parties, and the nature and extent of their contract, and fix and explain the meaning of words."

In *Wilcox* v. *Wood*, 9 Wend., 345, the question was as to when, at what hour, a lease from the 1st of May to the 1st of May in a succeeding year terminated, and it was held competent to show that, by universal custom, such a lease would terminate at twelve M. on the 1st of May.

In *Grant* v. *Maddox*, 15 Mees. & W., 737, the court went as far as in any other case which we have examined. In that case, the action was upon a contract to pay the plaintiff for her services as an opera singer, so much per week for each week in the three years for which she was engaged, and the controversy was as to whether plaintiff was entitled to receive the stipulated sum for each week during the whole of the three years, or only for each week during the theatrical season of those years. The court held that it was competent to prove a custom, by which a year was regarded as only the theatrical season, and not the whole calendar year.

In *Higgins* v. *Moore*, 34 N. Y., 417, the question was whether a purchaser of grain in the city of New York, negotiated by a broker, would be discharged by payment of the purchase price to the broker. *Held*, that he would not, as the broker's agency terminates when he makes the sale, and he has no authority to

receive the purchase money; and that evidence of any local usage in New York, to the contrary, was not admissible to control the general rule of law.

In *Bower* v. *Jones*, 21 E. C. L. R., 224, it was held that where there was an express agreement that the principal should be responsible for bad debts, proof that the custom of the trade was that commissions should not be allowed on bad debts, could not be received, because in violation of the express terms of the agreement.

From this review of the cases cited above, as well as from the examination of others which we have not deemed it neces-sary to cite, it is obvious that there is not entire harmony in the decisions, but we are of opinion that the proposition laid down at the outset of this discussion is supported by the weight of authority as well as by reason.

Our next inquiry is, whether the contract which constitutes the basis of this action is of such a character as to require or warrant a resort to evidence of custom or usage in order to explain any ambiguity therein, or to interpret the meaning of terms used therein which have acquired some secondary meaning. We are unable to discover any ambiguity in the terms of the contract. The amount of the article sold, the price, the times of delivery, and the time and mode of pay-ment, are all distinctly specified; and we are equally unable to discover any terms used therein which require interpretation. We do not see, therefore, how the first defence can be sustained.

The second defence set up in the answer is thus stated in the argument of counsel for appellant: "That the plaintiff himself brought about such changes in the original contract of sale as precluded his right to commissions under it."

An examination of the answer will show that this de-fence, as above stated, is not therein stated, for all the allega-tions in reference to the several changes in the terms of the contract of sale, are stated to have been proposed or insisted upon by the plaintiff, *as agent of the purchaser,* and not as broker—the language of the answer in each instance being that the several alterations were requested by the plaintiff, "repre-senting the Caddo Fertilizer Company," and not by him as

broker.  Now, it is conceded that the plaintiff had effected a valid contract for the sale of the fertilizers, assented to in writing by both vendor and vendee, as evidenced by the signatures of both of these parties, it seems to us that the plaintiff's connection with the matter as broker terminated, and he was then entitled to his commissions.  If, afterwards, acting as the agent or the representative of the purchaser, the plaintiff sought to procure from the defendant some modification of the terms of the sale, we do not see how this could affect his right to commissions which had previously been earned.

The third defence set up in the answer, is stated in the argument of counsel for appellant in these words, "That the customer or purchaser produced by the plaintiff was not able to pay for the material according to the terms agreed upon."  In the first place, we do not find any allegation in the answer that the purchaser, the Caddo Fertilizer Co., was not able to pay for the fertilizer purchased; and there is no allegation of insolvency.  The nearest approach to such an allegation is, that the purchaser did not meet the draft drawn upon it when it became payable, and requested an extension, "for the reason that the Caddo Fertilizer Co. were not able to pay the first draft, *at that time* [italics ours].  This allegation does not usually or necessarily imply insolvency (*Akers* v. *Rowan*, 33 S. C., 451), and something more is necessary to establish a charge of insolvency.  It only implies an inability to meet the draft at maturity, and not an inability to pay the debt, or a want of sufficient assets to do so.  The case just cited shows that the interpretation placed upon the words "insolvent" and "insolvency," as used in the U. S. Bankrupt Act, by the Supreme Court of the United States, is not recognized here, in cases not arising under such bankrupt act, but that those terms must be interpreted as signifying "that condition in which a debtor is found, when his property is insufficient to yield a fund sufficient to pay his debts, through the agency of the process of law."  It is very manifest, that there is no allegation in the answer which would bring this case within the rule above stated; and hence, upon this ground, the allegations of the answer are not sufficient to sustain this third defence.

In addition to this, while it may be true, as a general proposition, that a broker, before he is entitled to his commissions, must produce a purchaser willing and able to comply with the terms of the contract of sale, yet if the purchaser produced by the broker is accepted by the seller, without any misrepresentation on the part of the broker as to the financial ability of the proposed purchaser, and without the suppression by the broker of any knowledge he may have as to the financial condition of such purchaser, then the burden of proof is upon the seller, to show that the proposed purchaser is not able to comply with the terms of the contract. It seems to us, after a careful examination of the cases cited upon this point, some of which we will notice below, that the true rule upon this subject is well stated in *Coleman* v. *Meade*, 13 Bush (Ky.), 358, as follows: "The broker undertakes to furnish a purchaser, and is bound to act in good faith in presenting a person as such, and when one is presented, the employer is not bound to accept him or to pay the commission, unless he [the purchaser] is ready and able to perform the contract on his part, according to the terms proposed; but if the principal accepts him, either upon the terms previously proposed or upon modifications then agreed upon, and a valid contract is entered into between the principal and the person presented by the broker, the commission is earned. But if, as was the case in *McGavock* v. *Woodlief* (20 How., 221), the principal rejects the purchaser, and the broker claims his commission, he must show not only that the person furnished was willing to accept the offer precisely as made, but, in addition, that he was an eligible purchaser—by which we understand, was a person able to carry out the contract, and such as the principal was bound, as between himself and the broker, to accept."

This distinction between a case in which the seller accepts the purchaser offered by the broker, and a case in which the seller rejects such purchaser—which we think is a just and proper distinction—appears to be ignored in some of the cases, and disregarded or rejected in others. In *Kimberley* v. *Henderson*, 29 Md., 512, it was held that a broker is not entitled to his commissions unless he finds a purchaser able and willing to

carry out his contract, and a sale is actually made. In ·that case the broker did find a purchaser, who was accepted by the seller, and the contract was actually executed; but as the contract contained a stipulation that if either party failed to comply with the contract, he should pay to the other the sum of $1,000, and as the proposed purchaser failed to comply and paid the forfeit, the court held that the broker could not recover his commissions on the purchase price agreed upon, but only on the amount of the forfeit received by the vendor. That case is not, therefore, exactly in point. The cases of *Duclos* v. *Cunningham*, 102 N. Y., 678; *Iselin* v. *Griffith*, 62 Iowa, 668, and *McLaughlin* v. *Wheeler*, 47 N. W. Rep., 816, simply hold the general doctrine that a broker, before he can claim his commissions, must produce a purchaser able and willing to comply, and do not go into the question of the effect of the seller accepting the proposed purchaser.

The case of *Butler* v. *Baker*, 17 R. I., 582 (23 Atl. Rep., 1019), in its dicta is the strongest cited by appellant upon this point. In that case the broker found a purchaser, and presented him to the owner of the land, who accepted him and entered into a contract upon the terms proposed. But when the last payment was to be made the purchaser was unable to do so, and the court held that the broker was not entitled to his commissions. The conclusion reached in that case seems to have been rested partly upon the ground that the vendor knew nothing of the financial condition of the purchaser, and was not informed as to his condition by the broker, which the court said it was his duty to do. It is also there said that the cases differ as to the question upon whom the burden of proof rests as to the financial condition of the purchaser—some holding that the burden of proof is upon the broker, upon the ground that he undertakes to find a purchaser able and willing to buy, and cites the cases, amongst which we find the case of *Coleman* v. *Meade, supra*, which, as we have seen, does not so hold, when the vendor accepts the purchaser, but just the contrary; and then cites other cases showing that the burden of proof rests upon the vendor; concluding that portion of the opinion in these words: "It is not necessary for us to decide this question," for the reason that

no testimony was offered by the broker to show the purchaser's financial ability, while the defendant did offer such testimony as would justify the jury in finding that the purchaser was unable to comply with the contract. It is obvious, therefore, that the case of *Butler* v. *Baker* affords no authority as to the question of the burden of proof.

In *Love* v. *Miller*, 21 Am. Rep. (Ind.), 192, it was held that where a broker, employed for that purpose, produces a purchaser, who enters into a valid contract with the owner of certain real estate for the purchase of the same, the broker has earned his commissions, notwithstanding the fact that the purchaser afterwards declines to perform his part of the contract. In that case nothing is said as to the financial ability of the proposed purchaser. In *Vinton* v. *Baldwin*, 45 Am. Rep. (Ind.), 447, it was held that a person employed to procure a loan for a commission is entitled to his commission on finding a person able and willing to make the loan, although the proposed borrower afterwards declined to accept the loan. In that case the court likened the case to that of a broker employed to sell real estate, in which case the court said: "It is uniformly held that the commissions are earned when a purchaser is found able and willing to buy on the terms proposed * * * and does not depend upon the ultimate consummation of the sale."

From this review of the authorities, and after due consideration of the reasons upon which they are based, we are of the opinion that the facts stated in the answer are not sufficient to sustain the third defence, and, therefore, there was no error in sustaining the demurrer to that defence.

It only remains for us to consider what is stated in the answer as to the third defence, but styled in the argument the fourth defence. That defence, it is claimed in the argument of the counsel for appellant, raises the following question: "Can a broker, who has not procured a license to do business, required by a valid city ordinance, maintain an action to recover his commissions?" It is alleged in the answer, and the demurrer admits it to be true, that the plaintiff had failed to procure a license to do business as a broker in the city of Charleston for the year 1890, during which year the transac-

tion here in question took place, as required by an ordinance passed by the city council of Charleston, under the authority conferred upon said city council by an act of the General Assembly of this State. Acts of 1881, 17 Stat., 582. This act simply invests the city council with authority to require the payment of a license fee from any person engaged in any calling, business, or profession within the limits of the city of Charleston, with certain exceptions which need not be stated, and authorizes the city council to pass such ordinances as may be necessary to carry the intent and purposes of the act into full effect. The intent and purpose of the act, as declared in its title, is to authorize the city council to impose "a license tax" on persons engaged in any business in the said city. But there is nothing in the act declaring it to be unlawful for a person to engage in any business for which a license may be required, without obtaining such license.

In pursuance of the authority thus conferred, the city council of Charleston, in December, 1889, passed an ordinance, set out in the record, which provides substantially as follows: Sec. 1. "That every person * * * engaged in, or intending to engage in, any trade, business, or profession hereinafter mentioned, shall obtain, on or before the 20th day of January, A. D. 1890, a license therefor," &c. Sec. 2 provides, "That if any person or persons shall exercise or carry on any trade, business, or profession, for * * * which a license is required by this ordinance, without taking out such license, he, she, or they shall, for each and every offence, be subject to a penalty not exceeding $100, * * * and the same shall be entered up as a judgment of the court, and execution shall issue against the property of the defendant, as for the collection of other taxes and penalties." The other provisions of the ordinance do not seem to be pertinent to the question made in this case, except that brokers are mentioned as amenable to the provisions requiring a license. It will be observed that the ordinance contains no express provision making it unlawful for a person to engage in business as a broker, but simply imposes a penalty upon a person who does not obtain a license. It is conceded, and properly conceded, that if the law requiring a license

actually and in terms declares that the business in question is unlawful, unless the requirement of a license is complied with, then the carrying on of the business without such license is prohibited, and a contract made under it cannot be enforced in a court of justice. For, as is said in one of the cases hereinafter cited, it would be "altogether anomalous, not to use any harsher term, to hold that a court of justice should enforce a contract founded upon an act which is absolutely forbidden by the law-making department of the government;" or, as is said in another case: "It would, indeed, be a strange anomaly if a contract, made in violation of a statute, and prohibited by a penalty, could be enforced in the courts of the same country whose laws are thus trampled upon and set at defiance." See *McConnell* v. *Kitchens*, 20 S. C., at page 439, and *O'Donald* v. *Sweeny*, 5 Ala., 468.

It seems to us, however, that even where the statute does not, in express terms, declare the act unlawful or prohibit the carrying on of the business in question without a license, yet if it appears from a consideration of the terms of the legislation in question, that the legislative intent was to declare the act unlawful or to prohibit the carrying on of the business without a license, then no contract in pursuance of such business can be enforced. In other words, the inquiry is as to the legislative intent, and that may be found, not only in the express terms of the statute, but also may be implied from the several provisions thereof. See *Harris* v. *Runnels*, 12 How., 79, and *Niemeyer* v. *Wright*, 40 Am. Rep., 720. An important element which enters into the inquiry as to the legislative intent, seems to be whether the license is required simply as a mode of raising revenue—a tax pure and simple—and that the penalty is imposed as a means of enforcing the payment of such tax, and not for the purpose of prohibiting the business; for while some of the cases do lay down the broad proposition that the imposition of a penalty implies a prohibition, we do not think that such is the necessary implication, as it may be imposed simply for the purpose of enforcing the payment of the license tax, and if so, then prohibition is not to be implied. We will next notice the cases cited in the argument, which, we think, show

that the weight of authority as well as of reason support the views hereinbefore set forth.

The case of *Westmoreland* v. *Bragg*, 2 Hill, 414, is not in point, for the reason that the statute not only forbids the carrying on of the business of an apothecary without a license, but also expressly declares all contracts made by an unlicensed apothecary, in the course of his business, "utterly void and of no effect." In *McConnell* v. *Kitchens*, 20 S. C., 430, the action was upon a contract for the sale of fertilizers, which the court held illegal and void, because the act regulating the sales of such articles had not been complied with, and that such act was not designed simply for the collection of revenue, but to protect the public from imposition and fraud, and hence a sale of any such article without a compliance with the requirements of the statute was illegal and void. It is obvious that the case does not apply to the case now under consideration.

In *Miller* v. *Ammon*, 145 U. S., 421, the action was on a contract for the sale of wine, held to be "spirituous or vinous liquor," by a person not having a license so to sell, and the court held that the contract could not be enforced. But in that case the ordinance of the city of Chicago requiring a license, expressly forbid *the sale* of spirituous or vinous liquor without a license, and did not, as in this case, simply require a person engaged in such business to obtain a license. That case, therefore, differs from the case now under consideration. In *Holt* v. *Green*, 13 Am. Rep. (Penn.), 737, it was held, by a divided court (Sherswood and Williams dissenting), that a commercial broker, who had not procured a license as required by the act of Congress, is not entitled to recover his commissions upon a sale made by him. The court, in its opinion, admits that there is a conflict of authority upon the question. In *Johnson* v. *Hullings*, 49 Am. Rep. (Penn.), 131, the court simply follows *Holt* v. *Green*. *Buckley* v. *Humason*, 16 L. R. A., 423, simply decides, that where a statute or an ordinance duly authorized, makes a particular business unlawful for unlicensed persons, any contract made in such business by one not authorized is void. In the notes to that case a good many authorities are collected, which seem to show that the weight of authority is

in favor of the view that the mere requirement of a license does not make the business unlawful without such license, unless the statute or ordinance either expressly or impliedly declares the business to be unlawful if carried on by a person without a license, and this implication may arise from the fact that the statute has in view the protection of the public health or morals, or the prevention of frauds upon the public.

In the case of *Mandlebaum* v. *Gregovich*, 28 Pac. Rep., 121, the true distinction in cases of this kind is well pointed out in the following language: "Numerous authorities are cited by respondent's counsel which announce the general proposition that a penalty implies a prohibition, though there be no prohibitory words in the statute, and that the agreement in violation of the statute, prohibiting or enjoining an act absolutely, or only under a penalty, cannot be enforced. This principle is applied in all cases where the subject matter of the contract is forbidden by the statute [citing the cases], or is in violation of a statute for the protection of the public against imposition or fraud [citing the cases, but omitting the case of *McConnell* v. *Kitchens*, *supra*, which is on that line], or for the protection of the public health or morals [as in the case of sales of spirituous liquors], or where the contract is against public policy." But the court goes on to show that the contract there in question did not fall within either of those classes, and hence there was no illegality in *the sale*, but simply an illegality in the conduct of the seller, in not procuring a license, for which *he* may be subjected to a penalty, but the sale itself was not unlawful.

In *Shippey* v. *Edwards*, 9 Ala., 200, the action was on a note, to which the defence was, that the note was given on Sunday, in violation of the statute forbidding the transaction of any worldly business on Sunday, with certain exceptions, and subjecting the offending party to a penalty; and it was held that the contract, made on Sunday, was void. The court does go on to say: "It has been repeatedly held that a penalty inflicted by a statute upon an offence implies a prohibition, and a contract relating to it is void, even where it is not expressly declared by the statute that the contract shall be void." But this is a mere *dictum*, for in that case the statute did, in express

terms, forbid the making of any contract, except as excepted, on Sunday, and hence there was no necessity for implying a prohibition from the imposition of a penalty. The case of *Woods* v. *Armstrong*, 54 Ala., 150, is very much like our own case of *McConnell* v. *Kitchens, supra*, and falls under that class of cases mentioned in *Mandlebaum* v. *Gregovich, supra*, where the sale of the fertilizers was made in violation of a statute intended to prevent imposition or fraud.

The cases of *Johnson* v. *Hudson*, 11 East., 180, *Cope* v. *Rowlands*, 2 M. & W., 149, and *Smith* v. *Mawhood*, 14 *Id.*, 452, show that the true inquiry in all cases of this kind is, whether the legislative intent was to declare the business unlawful if carried on without a license, or simply to impose a penalty *upon the person* who engages in such business without a license. If the former, then no contract made in the pursuit of such business can be enforced; but if the latter, then it may be, and the penalty is simply for the purpose of requiring the person engaging in the business to pay the license tax imposed.

Looking at this case in the light of these authorities, it seems to us that there is nothing, either in the statute or in the ordinance passed in pursuance of such statute, which indicates an intention to declare the business of broker unlawful if carried on without a license, but that the real object was to enforce the payment of the license tax, by imposing a penalty *on the person* who may engage in such business without paying the license tax. The history of the act of 1870, under which the city council of Charleston undertook to impose license taxes on certain occupations pursued within the city of Charleston, as well as that of the act of 1881–82 above referred to, which was passed to repair the defect in the act of 1870, may be traced in the cases of *Charleston* v. *Oliver*, 16 S. C., 47, and the case between the same parties, practically, in 21 S. C., 318, and shows very clearly that the sole object of this legislation was simply to enable the city council of Charleston to impose license taxes in aid of the revenue of the city, and not for the purpose of making any business or occupation unlawful. Indeed, the very terms of the city ordinance show that it was not the object to make the business of a broker unlawful, for it expressly

contemplates that the business of a broker may be lawfully carried on in the city of Charleston, for a part of the year—until the 20th of January of that year—without a license, which is a clear indication that it was no part of the legislative intent to condemn the business of a broker, as contrary to the public policy of the city, and that the imposition of a penalty upon a person who engages in the business of a broker after the date, without obtaining a license, was solely for the purpose of enforcing the payment of the license tax on brokers, and not for the purpose of declaring such business unlawful.

We do not think, therefore, that there was any error in sustaining the demurrer to what is stated in the answer as a third defence, which is, however, claimed in the argument to be a fourth defence. Under this view the other questions discussed in the argument, as to the place of the contract, and as to the effect of the interstate commerce law, do not arise, and need not, therefore, be considered.

The judgment of this court is, that the judgment of the Circuit Court be affirmed.

In this case a petition was filed by appellant, praying a rehearing of the case, but the petition was refused by an order passed June 10, 1895,

PER CURIAM. A careful consideration of this petition fails to satisfy us that any material fact or principle of law has been either overlooked or disregarded, and hence there is no ground for a rehearing. It is, therefore, ordered, that this petition be dismissed, and that the stay of *remittitur* heretofore granted be revoked.