# DOTSON *v.* MILLIKEN.*

BROKERS; SALES OF REAL ESTATE; EVIDENCE.

1.  When an agent, employed for the purpose, procures a purchaser ready, able, and willing to buy on the authorized terms, he becomes entitled to his compensation although the sale may not be consummated, provided the consummation is prevented by the refusal, fault, or defective title of the principal. (Following *Bryan* v. *Abert*, 3 App. D. C. 180.)

2.  A broker employed to find a purchaser ready, able, and willing to buy on the principal's terms and in accordance with his representation of material facts is not bound or even empowered by the terms of his agency to effect an actual sale by a binding and enforceable agreement. (Following *Mannix* v. *Hildreth*, 2 App. D. C. 259.)

3.  Where a sale of real estate to a corporation fails of consummation because of a misrepresentation of fact by the owner, he cannot defeat a recovery in a suit by his broker to recover commissions, on the ground that the plaintiff has failed to show the corporate existence of the proposed purchaser, or that its president had authority to act for it in the negotiations,—especially where, during such negotiations, the owner was satisfied with the proposed purchaser, and did not question its power to purchase, or the authority of its president to act.

---

*\*Real Estate Broker—Commissions.*—The American and English authorities dealing with the right of a real-estate broker to commissions are presented and discussed in the following editorial notes: Sufficiency of performance of contract by broker to entitle him to commissions, note to *Lunney* v. *Healey*, 44 L. R. A. 593; when real-estate broker is considered as the procuring cause of the sale or exchange effected, note to *Hoadley* v. *Savings Bank*, 44 L. R. A. 321; negligence, fraud, or default of principal, or defective title, as affecting real-estate brokers' commissions, note to *Brackenridge* v. *Claridge*, 43 L. R. A. 593; fraud and secret dealings of real-estate broker as affecting commissions, note to *Leathers* v. *Canfield*, 45 L. R. A. 33.

4. *Quære,* Whether, in actions generally by brokers to recover commissions for procuring purchasers, where there has been no consummation of the sale, the burden is upon the broker to show the ability of the proposed purchaser to pay the consideration, or upon the seller to show want of such ability.

5. Where a principal accepts a purchaser found by his broker without questioning his ability to perform, and the sale fails of consummation by the principal's own fault or failure to make good his offer, the burden is on him, in order to defeat the broker's right to compensation, to show the purchaser's want of ability.

6. *Quære,* Whether a contract to sell a given number of acres of land out of a larger quantity owned by the vendor carries with it the right of reasonable selection by the vendee, and may therefore be rendered reasonably certain.

7. Where a broker employed by the owner of a large tract of land to find a purchaser of the whole or any considerable portion of it procures an offer for a certain number of acres that is acceptable to the owner, and the sale fails of consummation solely because of the failure of the owner to make good a representation of fact which is an essential condition of the sale, and not because of the proposed purchaser's insistence upon an unreasonable right of selection, the owner cannot defeat the right of the broker to his commission, on the ground that the proposition of sale is too uncertain to be made the subject of an enforceable contract between the seller and the purchaser.

8. After a broker employed to sell land has procured an offer of purchase made in good faith, which is acceptable to his principal, his right to his commission cannot be defeated by subsequent futile efforts on the part of the principal to make good a representation of fact that is an essential condition of the sale.

No. 1642.   Submitted April 11, 1906.   Decided May 1, 1906.

HEARING on an appeal by the defendant from a judgment of the Supreme Court of the District of Columbia upon the verdict of a jury in an action in assumpsit.          *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a judgment for $25,000 rendered in an action of assumpsit.

The declaration of the plaintiff, William H. Milliken, alleged the following facts substantially: In April, 1902, the defendant,

Napoleon B. Dotson, represented to plaintiff that he owned and controlled 124,000 acres of coal lands situated in Letcher and Harlan counties, in the State of Kentucky; that he had secured an agreement with the Southern Railway Company to construct a branch railway into said lands, and that he desired to secure a purchaser for either the whole or a considerable part of said lands, at and for the price of $20 per acre; that if plaintiff would find a purchaser at said price defendant would allow and pay him $2.50 for each acre for which he should find a purchaser; that, relying upon such representations and promise, plaintiff applied himself diligently to find a purchaser or purchasers, and, after much labor and the expenditure of much time and about $2,500 in money during the space of five months, procured and furnished a responsible purchaser, namely, the Tri-State Coal & Coke Company of Pittsburg, Pennsylvania, which was, on, to wit, September 15, 1902, ready, able, and willing to purchase 10,000 acres of said lands at $20 per acre in cash, subject only to the truth of defendant's representations in respect of the construction of the railway into said lands; that it then transpired that the defendant's said representations were untrue, and that there had been no agreement to construct said railway; that had it not been for the said representations plaintiff would not have undertaken to find a purchaser; that for the reason aforesaid, and without plaintiff's fault, the said purchaser declined to proceed further in the matter of purchase. A second count stated the same facts substantially, and was followed by the ordinary common counts. Defendant filed several pleas, which were stricken out, and the case was submitted on his plea of *non assumpsit.*

Plaintiff introduced evidence tending to show the following facts in support of his declaration: That he heard of the proposed sale of defendant's lands in April, 1902, and received a letter from defendant dated April 24, 1902, relating to the offer of sale, and suggesting a meeting, and containing the following paragraph: "We have arranged with R. R. companies to build a branch into it and develop the lands." A typewritten, unaddressed letter accompanied this, which, after describing the

rich veins of coal in the lands, contained this statement: "We have an understanding with the railroads near the lands, by which they are to build a branch into the same for us as soon as we are ready to open up coal veins and put in coke plants." A prospectus was inclosed also, which contained a lengthy description of the lands, the extent of the coal seams, and an extract from the official report of the State geologist, John R. Procter, showing that the coal of the particular region was of an excellent quality. It contained a statement of the nearest railway lines and that "the L. and N. and Southern railways have both offered to build into this property at once," and the following: "The property having been made up by grouping together smaller tracts, it will be sold in any size tracts to suit purchasers, and can be laid off and sold in separate blocks, so as to render each block desirable and well located for coal and coke plants, or it will be sold together," etc. That by appointment he met defendant in Washington on April 30, and told him he was familiar with the section and knew the land and its value, but that the important thing was the railway to get to market. That defendant said he had an arrangement with Spencer of the Southern Railway to build a road in there from Middleboro at once, and that the surveyors were in there locating a line from Middleboro to Harlan Court House, which is just at the edge of the land. That he then agreed with defendant to visit Pittsburg and secure purchasers for the property at $20 per acre, and defendant agreed to pay him $2.50 per acre for every acre that he could sell in such quantities as he could find purchasers for; plaintiff to pay his own expenses. That plaintiff would not have gone into the matter without the assurance as to the railway, because it was necessary to the utilization of the coal. That plaintiff at once went to Pittsburg and began negotiations with parties there. That the first question asked him by them was in regard to the contract for the railway construction; and upon plaintiff's replying that he had not made the contract, but that defendant had represented to him that there was such an arrangement, Easter, of the Tri-State Coal & Coke Company, with whom he was dealing, insisted that plaintiff should have

something in writing from defendant to that effect. That, communicating this fact to defendant, he received a letter from him, dated May 3, in which he referred to the general nature of the land, advantages, etc., but the only reference to the railway was in the following language: "This is property which will be developed by the building of the R. R. through it at once, which will increase the value of it several times over." That the Pittsburg people were not satisfied, as they feared there were some conditions attached in regard to building the road, and insisted that plaintiff should state what conditions, if any, were attached. That on May 8 plaintiff, in carrying out this suggestion, sent the following telegram to the defendant, who was then in New York: "See Spencer and write me to-night how much development he will require before building road into property. Would two hundred coke ovens be sufficient to start with?" That a letter of the same date in reply was received in due course of mail, which contained the following: "I have already discussed fully with Mr. Spencer the point with reference to extent of development he would like to have on the property to commence with, and am glad to say that Mr. Spencer is willing to build the road into the property without placing any requirements on the property holders to put in certain sized plants, or any number of coke ovens. I have explained fully to Mr. Spencer our plans for the development of the land, and he is now ready to commence work on the road just as soon as we are ready for him to do so, and we can use our own judgment to the extent of the development we would put on the lands to commence with. Mr. Spencer has investigated the situation and knows the Southern and Louisville & Nashville Railroad can furnish a market for a vast amount of coal and coke from this field." * * * That Easter seemed satisfied with this letter, which was shown to him, and agreed that he would take the matter up if plaintiff would procure samples of the coal and have it tested in Pittsburg to see if it would make good coke. That plaintiff went to Wise county, Virginia, where defendant lived, and with a friend, under the direction of a guide furnished by the defendant, rode over the mountains and spent a week inspecting the lands.

That he returned to Pittsburg May 27 with samples of coal, the first analysis of which was not satisfactory; but a second was better. That Easter was pleased and proposed to go with plaintiff to see the lands in company with a mine expert. That correspondence passed between plaintiff and defendant at frequent intervals. One letter from defendant dated May 29, and relating to sending samples of coal, had this postscript: "I understand the Southern Ry. Co. has secured their right of way with exceptions of through one or two tracts from Middleboro to Harlan C. H. I hope, however, Mr. Spencer will call his men out and keep them out until we get our tracts rounded up as we have requested him to do. I presume your people will be in a position to give us a definite answer as soon as they have tested the coal. We have another proposition from a party wanting an interest down there, and would like to have your people conclude as soon as possible." Another letter of defendant, dated June 12, expressed satisfaction with the result of the experiments with the coal, and said: "The engineers are now locating the line of the Southern into our property. It would not be necessary for me to accompany Mr. Easter to see Mr. Spencer, as Mr. Spencer's plans are already fixed; he would not hesitate to say to Mr. Easter that he will build the road into that section at once." In another of July 8, replying to a complaint of plaintiff that one Ingraham had offered the same lands for $15 per acre, and explaining the same by stating that the price had been raised by reason of the railway arrangement, he said: * * * "the R. R. is now located too near the property, and work will soon be vigorously pushed, and, of course, price will very soon be higher." That a letter of July 9 contained the following: * * * "and if your parties get advantage of this low price they will have to act promptly, as R. R. will soon be built and the price will advance greatly. How much do your people want? Do they want the entire tract or do they want only part of it? If you will let me know the exact number of acres they want to purchase, if they find the coal satisfactory upon further investigation, I will place you in a position to give them refusal of the property for sufficient time to look it over and say whether or not they want it

* * * We are now having titles abstracted, surveys made, etc., and no long option will be given on the property. Appreciating the amount of work and expense you have been to in trying to handle the property, we will give your people time to look the property over and give me a definite answer as to whether or not they take it." That the following option was proposed and executed by defendant, who knew that Easter was president of the Tri-State Coal & Coke Company and represented it in the transaction:

Virginia Coke & Steam Coal Co. hereby grants to T. J. Easter, of Pittsburg, Pennsylvania, an option to purchase 10,000 acres of land in Harlan county, Ky., at the price of $20 per acre, at any time within sixty days from this date, in consideration of and on condition that the said T. J. Easter shall forthwith send an engineer to examine and report on said lands. Said examination to be completed and report made and said Virginia Coke & Steam Coal Company notified within thirty days from this date, and upon receipt of said report said T. J. Easter shall elect as to whether or not he will accept this option and purchase said property, and if on receipt of said report the said T. J. Easter notifies said Virginia Coke & Steam Coal Company of his decision to purchase the said lands within said thirty days, then the said purchase is to be completed, the money paid, and deed in fee to said land executed within sixty days from this date.

Witness the following signature on this 24th day of June, 1902:

                    Virginia Coke and Steam Coal Company.
                              By N. B. Dotson, President.

That the investigation made by experts was satisfactory, and the Pittsburg parties agreed to take 10,000 acres at the price named. That plaintiff had no authority to execute a contract for sale, and telegraphed defendant to come. That defendant arrived in Pittsburg on September 3, 1902, and the parties all met in plaintiff's room in hotel. That the Pittsburg people announced themselves ready to take 10,000 acres of the land,

but must have assurances in regard to building the railroad. Defendant then said he had simply a verbal arrangement with Spencer, but that he could get a letter from Spencer saying that he would build a road through there at once, and also said that engineers were there locating the road, and there would be no question about it. That the purchasers announced that a letter from Spencer would be satisfactory. That defendant asked plaintiff to go to New York and see Spencer and get the letter. That he did so and found that Spencer had gone to Europe. That plaintiff told the purchasers the situation, and asked them to give him more time to get a letter from Spencer before abandoning the purchase. That, not having obtained the letter from Spencer in the meantime, the purchasers, in the latter part of October, announced to plaintiff that they could not wait longer, and were making arrangements for other coal lands. The evidence of Samuel Spencer, in connection with correspondence between him and defendant, tended to show that there had been no agreement with defendant to build his railway into the lands. That the same was contemplated, and preliminary surveys made, and so forth, but that all was based upon satisfactory assurances of a sufficient amount of business, which had not been obtained.

The testimony of Thomas J. Easter, called for plaintiff, tended to show that he was the president of the Tri-State Coal & Coke Company of Pittsburg, and represented it in negotiations with plaintiff for the purchase of coal lands in Harlan county, Kentucky. That he was not willing to invest in any property that could not be developed almost immediately. That plaintiff produced defendant's letter of May 8, 1902, stating that he had completed arrangements with Mr. Spencer to construct a road into said lands without any particular assurances as to improvements that would be necessary. That after procuring the option Wilson and Koonts, representing the Coal & Coke Company, made a trip over the land. That in an interview with defendant in September, in Pittsburg, they informed him that they would take 10,000 acres at $20 per acre if he could show some tangible arrangement between himself and the railway company to build the line. That defendant said he had

Mr. Spencer's assurance to build the road whether operations were begun at once or not, but not in writing, and that Mr. Spencer's word was as good as a written contract. That defendant promised to effect a meeting between ourselves and the railway people, at which meeting he was sure a written agreement could be had. That nothing had since been heard as regards willingness to proceed with the railroad. That he did not buy the land for the reason that there was no arrangement for the construction of the railroad. That we failed to close at that meeting because defendant could not assure us that any railroad would be built, and therefore gave up the matter and purchased coal lands elsewhere. That they would not think of buying lands in that section without a railroad, and had refused to take up the matter seriously until shown the defendant's letter of May. 8, 1902. That at an interview thereafter defendant stated there was no question about the railroad being built, that men were then working on the road while we were there, and had been taken off at the present time by an arrangement between him and Spencer to enable defendant to secure further options. That witness wrote a letter to Mr. Spencer on August 23, 1902, making inquiry about the railroad, which was replied to by W. W. Finley, second vice president of the Southern Railway Company, on August 29, 1902, in which he said: "The construction of a line in the territory mentioned by you is now under investigation and consideration, but no final conclusions have been reached. Conclusions in the matter would be greatly facilitated if we could be advised from time to time of actual developments which parties in control of the lands contiguous to such line would obligate themselves to undertake. I shall be pleased to hear from you further on the subject." That the interview with Dotson, at Hotel Henry, was subsequent to the receipt of the letter from Finley. That witness had the letter, but did not show it to Dotson. That while they had their own ideas that no railroad would be built, they had been given to understand by Milliken that a bona fide agreement existed between Dotson and Spencer, and Dotson at the meeting gave them to understand that such agreement did exist; though not

in writing. That they refused to take the matter up on Dotson's letter in October for the reason that they had purchased and begun operations in another field. That they abandoned the proposition to purchase some time after this meeting, and that the failure of Dotson to produce evidence of the agreement to construct the railway had everything to do with the decision not to purchase; that they decided at once after the meeting at Hotel Henry to abandon the idea of purchasing the land.

W. W. Finley testified to the letters produced, and to a conference in New York on September 23 with Dotson and one Perin, who had negotiations to purchase; but did not remember that Milliken was present. That the matter of railway construction was then "drifting along."

In connection with plaintiff's evidence was also read a letter to him, addressed to Pittsburg, on August 26, 1902, replying to his telegram relating to the offer of the parties, and containing the following: "Your telegram informing me that your parties have decided to take 10,000 acres positively, and possibly 20,000 acres, is received. I presume you will have heard from Mr. Spencer before this time, and you will be down at once to close the matter up." This was posted at Wise, Virginia, where defendant resided. The letter of plaintiff, following the telegram aforesaid, was dated August 25, at Pittsburg, and contained this statement: "I have met Mr. Easter and they have decided to take the 10,000 acres of coal lands, on condition that Mr. Spencer will assure them as to the building of the railroad to Harlan C. H. They have written to Spencer, and stated what they proposed doing, and asked as to the railroad. So, if his answer confirms what you have represented on this point, they will close the purchase for 10,000 acres." Then followed a complaint that Easter had letters from two other parties offering some of the lands at $12.50 and $15 per acre, and that some other parties had gotten the analysis that had been made for plaintiff, and warning him that no deal must be made with Easter and his people, the Tri-State Coal & Coke Co., at less than $20, and only through plaintiff, "unless *you* are willing to reduce the price on your own account

without affecting me." This paragraph then followed: "But this would be utterly unnecessary. They have made up their minds to buy the 10,000 acres at $20 if they cannot get it for less, if Mr. Spencer satisfies them he will build the road. If he does not, they do not want the land at any price." There were other letters from plaintiff to defendant during September, 1902, tending to show that plaintiff was still trying to get some satisfactory statement from the officers of the Southern Rail; way Company (Mr. Spencer being still in Europe) concerning the building of the railway. · Defendant testified that at the meeting with plaintiff in April, 1902, he authorized him to sell at $17.50 per acre, agreeing to give him all that he could get in excess of that sum. He also read in evidence the correspondence between him and Spencer in 1902 relating to the railroad construction, that has been referred to in connection with Spencer's testimony. It is lengthy, and does not show that Spencer had ever entered into the alleged agreement to build the railroad, but was giving the matter favorable consideration. He also testified that plaintiff saw one of Spencer's letters of May 13, 1902, and that "Spencer did not say that the road would not be built; said he would consider it favorably."

Defendant also testified that he went to Pittsburg in response to plaintiff's telegram to come and close the deal. That he showed Easter a map of the location of the lands, and explained to them the terms on which the railroad would agree to build. That Easter suggested that defendant would better get a letter from Spencer—something in writing to bind him to construct the road; that they did not think they would go into the matter upon a simple statement from Spencer that he would build the road; and that defendant would have to get a letter from Spencer. That defendant thought if Easter would see Spencer and let him know just what he was willing to do in the way of the development of the property, Spencer would not object to giving him a letter of that kind. That they promised to do that, and said they would arrange to see Spencer, to have a conference to see what arrangements could be made. That at the time defendant gave Milliken a letter of introduction to Spencer to

go and see what arrangements could be made. This letter, dated September 5, 1902, stated that plaintiff calls in the interest of the Pittsburg coal people, who want to join us in the development of some of the Harlan County coal lands, if they know that a railroad will be built into them in the near future. * * * He further testified that he had all of the Spencer correspondence with him, and showed it to Milliken, and, he thinks, to Easter also; and after that Easter said he would not go into the deal unless they got a written contract with Spencer. In regard to the option, he testified that plaintiff brought it to him at his home, and had put in a clause making .it conditional on the building of the road, and the defendant changed this.

One Charles P. Perin testified for defendant concerning purchase made by people represented by him of 30,000 acres of the Harlan county lands in September, 1902, and that in interviews concerning the railway plaintiff was present with him and Finley, the vice president of the Southern Railway Company, and plaintiff then knew that no agreement had been made to build the railway. Several witnesses testified to declarations made to them by plaintiff when in Harlan county, and while he was inspecting the lands, that no railway had been promised to be built, etc.

Plaintiff, in rebuttal, denied the statements made by defendant, by Perin, and by the last-named witnesses.

*Mr. James H. Wood, Mr. A. S. Worthington,* and *Mr. George C. Hazelton* for the appellant.

*Mr. J. J. Darlington* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court:

1. The first assignment of error is founded on exceptions to the following instruction given to the jury at the request of the plaintiff:

"If the jury believe from the evidence that the defendant, on or about the 30th day of April, 1902, represented to the plaintiff that he, the defendant, was desirous of securing a purchaser for either the whole or any considerable quantity of the Harlan county coal lands at the price of $20 per acre; that he had obtained from the Southern Railway Company its consent or agreement to construct a branch railroad into the said coal lands; and that he would pay to the plaintiff the sum of $2.50 for each and every acre for which he should find a purchaser at and for the price of $20 per acre, and that shortly thereafter, namely, on or about the 8th day of May, 1902, he further represented to the plaintiff that the Southern Railway Company was willing to build the said railroad into the said property without placing any requirements on the holders of the said lands to put in any certain size of plants or number of coke ovens, and that the plaintiff relying upon the said representations of the defendant, expended time and effort in the attempt to find a purchaser, and did find a purchaser able, ready, and willing to purchase 10,000 acres of the said lands at the said price, provided the defendant's said representations were correct; and that the said sale failed because of the inaccuracy of the defendant's representations that the said railway company had so consented or agreed to construct a branch railroad into the said lands,—then the plaintiff is entitled to recover the said stipulated sum of $2.50 per acre on the said 10,000 acres, or $25,000 in all."

It is convenient, and will save some consumption of time, to consider the above assignment of error in connection with those founded on exceptions taken to the refusal of the second and eighth special instructions asked by the defendant, as follows:

2. "If the jury believe from the evidence that the plaintiff entered into the special agreement with the defendant as alleged in the declaration, by the terms of which his compensation or commission depended on the sale of the lands at a stated price, or on procuring a purchaser at the owner's price and terms; and that said plaintiff did not, in accordance with the terms of

his said special agreement, effect an actual sale of the land by a binding and enforceable agreement obtained by him for the sale and conveyance of said land to a purchaser who was ready to close and able to perform such agreement of purchase,—then the plaintiff is not entitled to recover.

"And if you believe from the evidence that the plaintiff has shown simply a provisional arrangement for the sale or purchase of said land by general negotiation or written option, which may have been accepted or rejected by the proposed purchaser at his pleasure or privilege, and which sale or purchase was never consummated, then the plaintiff cannot recover."

8. "The burden of proof on the issue of the plaintiff having found a purchaser for the defendant's land, who was willing, able, capable, and ready to purchase 10,000 acres of such land, is upon the plaintiff; and if the jury believe from the evidence that the plaintiff has failed to prove that there was any such corporation as the Tri-State Coal & Coke Company of Pennsylvania; or has failed to prove that there was such corporation as the Tri-State Coal & Coke Company of Pennsylvania in existence at the date of the alleged sale of 10,000 acres of defendant's land to it; and has failed to prove that said alleged corporation as a corporation in fact was ready, willing, and had the financial ability to purchase and pay cash for 10,000 acres of defendant's land at $20 per acre; and has failed to prove that authority was given by the board of directors of said alleged corporation to T. J. Easter, its president, to make an arrangement to purchase, or to purchase said land for and in the name of said corporation; and has failed to prove that the acts of said Easter relating to negotiations to purchase said land or the alleged purchase thereof were never ratified by the board of directors or other proper authority of said corporation; or if the plaintiff has failed to prove either of the allegations of the declaration in this respect,—then the plaintiff cannot recover upon the allegations of the declaration."

(1) We are of the opinion that the foregoing instruction, given at the request of the plaintiff, was a statement of the law

applicable to the cause of action alleged and the evidence that was introduced.

It is well settled that when an agent, employed for the purpose, procures a purchaser willing and able to buy on the authorized terms, he becomes entitled to his compensation although the sale may not be consummated, provided the consummation is prevented by the refusal, fault, or defective title of the principal. *Koch* v. *Emmerling,* 22 How. 69, 16 L. ed. 292; *McGavock* v. *Woodlief,* 20 How. 221, 15 L. ed. 884; *Bryan* v. *Abert,* 3 App. D. C. 180, 181; *Cheatham* v. *Yarbrough,* 90 Tenn. 77, 79, 15 S. W. 1076; *Washburn* v. *Bradley,* 169 Mass. 86, 88, 47 N. E. 512; *Holden* v. *Starks,* 159 Mass. 503, 38 Am. St. Rep. 451, 34 N. E. 1069; *Knapp* v. *Wallace,* 41 N. Y. 477; *McFarland* v. *Lillard,* 2 Ind. App. 160, 166, 50 Am. St. Rep. 234, 28 N. E. 229.

(2) The contract between the parties, concerning which in this particular there was no conflict in the evidence, required the plaintiff to find a purchaser ready, able, and willing to buy on defendant's terms and in accordance with his representations of material facts. He was not bound or even empowered by the terms of his agency to effect an actual sale by a binding and enforceable agreement. *Mannix* v. *Hildreth,* 2 App. D. C. 259, 275; *Fitzpatrick* v. *Gilson,* 176 Mass. 477, 478, 479, 57 N. E. 1000; *Middleton* v. *Thompson,* 163 Pa. 112, 120, 29 Atl. 796; *McCreery* v. *Green,* 38 Mich. 172, 184, 185.

There was no error, therefore, in refusing the defendant's second instruction.

(3) Nor was it error to refuse the defendant's eighth special instruction aforesaid, for however sound the propositions of law therein enounced may be in the abstract, they have no application to the case made by the evidence.

Under all the conditions shown by the uncontradicted evidence, the proof of the corporate existence of the Tri-State Coal & Coke Company, and of its power to make the purchase, was sufficient for the purposes of the case. The defendant knew that the corporation was the proposed purchaser, and that Easter was its president, representing it in the transaction. Knowing this, he approved the action of the plaintiff and came

to Pittsburg, upon his suggestion, to execute the contract and receive the purchase money. He was apparently satisfied in respect of the power of the corporation to make the purchase and of the authority of Easter to represent it, for he made no inquiry and asked for no evidence. There was not the slightest indication that he had any doubt upon either point. He accepted the offer, and the only thing that prevented the consummation of the sale, so far, at least, as he knew or had reason to believe, was his failure to make good his representation that he had a contract or agreement for the construction of the railway to Harlan County Court House. Moreover, notwithstanding the failure then to close the sale, he undertook to remove the purchaser's objection, the reasonableness and materiality of which he did not dispute, and asked the plaintiff to continue the negotiations to that end. It seems quite clear, from all of the evidence, that the objections were the result of afterthought.

The refused instruction also declared that in order to recover it was incumbent upon the plaintiff to prove the financial ability of the purchaser to make good its offer. Whether in actions generally by agents to recover commissions for procuring purchasers, where there has been no consummation of the sale, the burden is upon the agent to show the ability of the proposed purchaser to pay the consideration, or upon the seller to show the want of that ability, is a question about which there is a conflict of authority. Some hold that solvency and ability are to be presumed; others maintain the opposite doctrine. In view of the particular facts of the case, we deem it unnecessary to express an opinion upon the broad question.

As we have seen, the defendant accepted the purchaser without condition or inquiry. He evidently had no more doubt of its ability to pay the consideration than he had of its authority to make such a purchase.

Whatever doubt there may be as regards the general question above stated, we are of the opinion that when the principal accepts the purchaser without question of his ability to perform, and the sale fails of consummation by his own fault or failure to make good his offer, the burden is upon him, in order

to defeat the agent's right to compensation, to show the pur-
chaser's want of ability. *Davis* v. *Morgan,* 96 Ga. 518, 520, 23
S. E. 417. In that case, where the facts were quite like those
in this, the court said:

"Upon this question the authorities are conflicting, but we
think the true rule is this: That, as a general proposition, a
broker who has been employed to sell is not entitled to recover
his commission unless he shows that he procured a person will-
ing, ready, and able to purchase upon the terms prescribed
by his principal; but where it appears that the proposed pur-
chaser was accepted by the principal, the burden is upon the
latter to show that the purchaser was not able to comply with
the terms of the contract [citing cases]. In the present case,
according to the defendant's own evidence, he accepted the
proposed purchaser without objection, recognizing him as an-
swering all the requirements; and there is no suggestion that
he was not entirely solvent. Indeed, it appears that the failure
to complete the sale was due wholly to the defendant's inability
to make a good title to the land. This being so, we think the
court erred in making the plaintiff's right to recover depend
upon whether he had established the ability of the purchaser
to pay for the land."

For other cases directly in point see *Lockwood* v. *Halsey,* 41
Kan. 166, 169, 21 Pac. 98; *Fairly* v. *Wappoo Mills,* 44 S. C.
227, 248, 29 L. R. A. 215, 22 S. E. 108.

Another contention urged by the appellant may be briefly
considered, though it would seem sufficient to say that it was
not made on the trial and has no foundation in any exception
that appears in the record. It is this: That the proposition
to sell 10,000 acres out of the larger quantity owned by the
defendant contained a description too uncertain to be made the
subject of an enforceable contract between seller and purchaser.

If a contract had been actually entered into between seller
and purchaser, and this was a suit for its specific performance,
or an action of damages for its breach, the question might be
a serious one, notwithstanding there are many decisions to the
effect that such a contract carries with it the right of reason-

able selection by the vendee, and may therefore be rendered sufficiently certain. *Wofford* v. *McKinna,* 23 Tex. 36, 46, 76 Am. Dec. 53; *Cheney* v. *Cook,* 7 Wis. 413, 422; *Walsh* v. *Ringer,* 2 Ohio, 327, 333, 15 Am. Dec. 525; *Brown* v. *Munger,* 42 Minn. 482, 44 N. W. 519; *Armstrong* v. *Mudd,* 10 B. Mon. 144, 50 Am. Dec. 545; *Lingeman* v. *Shirk,* 15 Ind. App. 432, 437, 43 N. E. 33; *Lauder* v. *Peoria Agricultural & Trotting Soc.* 71 Ill. App. 475, 481.

But we have no such case before us. The plaintiff had nothing to do with this question of uncertainty. He was employed to find a purchaser for the whole tract or any considerable portion of it. He procured an offer for 10,000 acres that was acceptable to his principal. The sale did not fail of consummation through any misunderstanding of the parties as to the land to be purchased, or any controversy respecting it, but solely by reason of the seller's failure to make good a representation of fact that was an essential condition of the sale. Had the seller and purchaser come together upon all other points, and yet failed to consummate the sale by reason of the purchaser's insistence upon an unfair and unreasonable right of selection, it may well be that the plaintiff could have lost his right to compensation. But nothing of the kind occurred, and the failure of consummation was the fault of the seller. Having, therefore, done all that he had contracted to do, he became entitled to the compensation promised therefor. In an analogous case, where a proposition for sale procured by an agent was accepted, and the purchaser made a part payment and tendered complete performance, which the seller refused, it was held that the seller could not set up the insufficiency of the contract under the statute of frauds, to defeat the agent's claim for compensation. The court said: "If the plaintiff was authorized to make the sale, * * * he is, under these circumstances, entitled to compensation, notwithstanding that the purchaser could not have been compelled to carry out his contract if he had chosen to set up the statute of frauds. It was the defendant's own fault that the sale was not consummated." *Holden* v. *Starks,* 159 Mass. 503, 38 Am. St. Rep. 451, 34 N.

E. 1069. And in another case heretofore cited, a lease having failed of consummation because of the party's misrepresentation of a material fact, the same court said: "Whether the covenant was insufficient under the statute of frauds was immaterial if the proposed tenant's omission to perform the covenant was not for that reason, but because of the defendant's own fault." *Washburn* v. *Bradley, supra.* See also *McFarland* v. *Lillard,* 2 Ind. App. 160, 164, 50 Am. St. Rep. 234, 28 N. E. 229; *Fitzpatrick* v. *Gilson,* 176 Mass. 477, 57 N. E. 1000.

As has been said heretofore, the plaintiff's duty under the contract was to find a purchaser, and not to enter into an enforceable contract with him.

The last question to be determined (other assignments of error having been practically abandoned on the argument) arises on the refusal of the court to give the defendant's fifth special instruction to the jury.

The refused instruction reads as follows:

"5. If the jury believe from the evidence that any bona fide purchaser was actually found by the plaintiff for 10,000 acres of said land as claimed in the declaration, upon the representations of said plaintiff to said purchaser as to the existence of a certain agreement between the defendant and the Southern Railway Company concerning the construction of a branch railroad into said lands, and the purchaser did not rely on the said statements and representations of said plaintiff, but with the knowledge or co-operation of said plaintiff and at his suggestion sought to verify the truth of such statements and representations during the pendency of the negotiations for the purchase of said land, before any transaction was closed for the purchase thereof, and that said purchaser had the opportunity of investigating, ascertaining, and verifying the truthfulness of such statements and representations, and took advantage of that opportunity by interviews, conferences, or written communications, either personally or by attorney, or by others, with the president and first vice president of the Southern Railway Company for the purpose of verifying the said statements and representations so made by the plaintiff as to any agreement

existing between the defendant and Southern Railway Company in regard to the construction of said branch railroad, and ascertained from the said officers of the said railway company, from time to time, during such negotiations and before September 15, 1902, the date upon which it is alleged in the declaration that said purchaser was found, that no agreement existed between the defendant and the said Southern Railway Company to build such branch railroad, but that the subject of building such branch railroad had only been discussed, and that the building thereof depended on the development and improvements to be placed on said land prior to the construction of any railroad, in the way of opening coal mines, establishing coke ovens, or furnishing the railroad with a sufficient amount of tonnage, and that said plaintiff and alleged purchaser had full knowledge and information from the proper officers of the Southern Railway Company of all the facts relating to the conditions upon which the said branch railroad would be constructed and of the nonexistence of any agreement between the defendant and Southern Railway as alleged, then the defendant is not responsible for the nonperformance of the alleged sale or purchase of the land between the plaintiff and the alleged purchaser, and you should find for the defendant."

This instruction was refused, as we draw from the remarks of the court recited in the bill of exceptions, not for the reason that it did not embody a sound rule of law in the abstract, but because it had no foundation in the evidence. As said by the learned trial justice, the evidence had no tendency to show that the plaintiff did not fully rely upon the defendant's representation of the promise to construct the railway to the land. Assuming it to be true, as testified to by the defendant, that the plaintiff, while he was engaged in efforts to procure a purchaser, saw the letters that had been written to the former by the president of the Southern Railway Company, Mr. Spencer, still, that correspondence did not inform him of the falsity of the representation upon which he acted. The letters do not contain a positive agreement to build the railway, but they do show that Mr. Spencer was deeply interested in the possible advantage to result from the development of defendant's lands,

and was willing to build upon some certainty of immediate development of the coal mines. Not only this, but during the time the plaintiff was engaged he was informed by the defendant that the railway engineers were surveying the line, and had secured almost the entire right of way. The only uncertainty regarding the construction of the railway that could reasonably be created in the mind of the plaintiff was in respect of the amount of development that the railway people would require as a condition. This is shown by the telegram of May 7, saying he would write to Spencer, and that the parties he was dealing with wanted to know positively about the railroad. It appears from the testimony, however, that he did not write to Spencer, and the latter testified that he received no such letter from the plaintiff. In reply to the telegram of May 3 the defendant wrote plaintiff on May 8, also quoted in the preliminary statement, in which he said that he had seen Spencer and that the latter was ready to build without any requirement as to development. On May 29 he wrote that the railway company had secured the right of way with a few exceptions, and that he had requested Mr. Spencer to call his men off until he could secure more land. On June 9 plaintiff mentioned the anxiety of Easter to know how soon the road could be built; that he had asked if he could have a talk with Mr. Spencer, and plaintiff had said yes. June 12 defendant answered this letter, saying that it would not be necessary for him to go with Easter to see Spencer, and that the latter would not hesitate to tell Easter that he would build at once. The tenor of defendant's entire correspondence up to the time that he received notice of the willingness of Easter to take 10,000 acres was to the effect that the road would be built at once. On August 25 plaintiff had brought the parties to agree to purchase, and telegraphed defendant to that effect. Plaintiff's letter of August 25 referred to his telegram and letter confirming the offer to purchase, and announced that the matter could be closed that week if Spencer should reply promptly to a letter written him by Judge Potter, who was one of the members of the Tri-State Coal & Coke Company. Plaintiff assented to the pur-

chasers' making inquiries of Spencer to satisfy themselves, and defendant, knowing it, concurred. Any other course on the part of either would have aroused the suspicion of purchasers. That they may have instituted inquiries could not affect plaintiff's right. It is true that Easter wrote to Mr. Spencer on August 23, asking him to give a definite idea as to when he could expect the railroad, as it would enable him to decide on taking the land. Mr. Spencer, it seems, went to Europe about that time, and the letter was answered by Vice President Finley on the 29th, who said: "The construction of a line in the territory mentioned by you is under investigation and consideration, but no final conclusions have been reached. Conclusions in the matter would be greatly facilitated if we could be advised from time to time of actual developments which parties in control of lands contiguous to such a line would obligate themselves to undertake."

This letter was not from Mr. Spencer, to whom all the references had been made, and while it showed that no positive agreement was acknowledged, indicated nevertheless a disposition to carry on the enterprise. Before this was received, however, the purchasers made their proposal in the faith of the representations made, and there is nothing to indicate that they would not have performed if defendant had been able to satisfy them that his representation was true, or would be made good by Mr. Spencer. Besides, the plaintiff had no knowledge of the letter. His work was done when he procured the offer, which there is nothing to show was in bad faith. What was thereafter done by plaintiff or any of the parties to secure the promise of railway construction in a fruitless attempt to consummate the sale could have no bearing on the rights of plaintiff which had accrued on or about August 25.

No error having been committed on the trial, the judgment will be affirmed, with costs. *Affirmed.*

A writ of error to the Supreme Court of the United States was prayed and allowed May 8, 1906.