ROBERT HIGGINS *et al.*, Appellants, *v.* GEORGE MOORE, Respondent.

A local usage in a particular trade is inadmissible to control the rules of law in respect thereto.

Authority given to a broker to sell property does not include authority to receive payment for the same, especially when the principal is known to the vendee.

The duty of a broker, in general, is ended when he has found a purchaser, and has brought the parties together: Per WRIGHT, J.

A local usage in New York, allowing brokers to receive payment for grain sold by them, when the seller resides out of the city, is not admissible in evidence for the purpose of establishing authority in the broker to receive such payment.

ACTION in Superior Court of New York to recover $2,569.77, the price of a cargo of rye sold to defendant in the city of New York, on the 27th of August, 1858. The sale was negotiated by a grain broker, but before the delivery of the grain the defendant was aware of the plaintiffs being the owners. The plaintiffs lived in Albany, and were dealers in grain. The rye was delivered on the 30th of August. Plaintiff Higgins was in New York at the time of the sale of the rye, but returned to Albany on the 29th, and did not return to New York until the 3d of September, prior to which last date the defendant had paid to the broker the price of the grain. These facts were found by the referee who tried the cause. He also found that the defendant paid the price to the broker, according to the usage of trade, in the city of New York, which allowed such payment when the seller resided out of the city of New York, and that the defendant owed nothing to the plaintiffs.

On appeal this decision was affirmed by the Superior Court, and the plaintiffs have appealed to this court.

*Samuel Hand*, for the appellants.

*John E. Parsons*, for the respondent.

PECKHAM, J.   The judgment was sustained in the Superior Court mainly on the ground that a grain broker, who had never had possession of the rye sold, but was only authorized to contract for its sale, had thereby an implied authority to receive the purchase-price. The court was not satisfied with the finding of fact by the referee as to the usage of trade, which allowed a payment to a broker, but did not set it aside. I agree that the evidence is entirely unsatisfactory to establish any such usage. To my mind, it is utterly insufficient. This court, however, has no authority to interfere with this judgment upon that ground. The fact, as found, is conclusive here.

The first question arising here, is, had the broker, merely as such, authority to receive payment? I think he had not. In *Baring* v. *Corrie* (2 B. & Ald., 138), HOLROYD, J., said, " a factor who has the possession of goods differs materially from a broker. The former is one to whom goods are sent or consigned. He not only has the possession, but generally a special property in them ; but the broker has not the possession, and so the vendee cannot be deceived by that, besides employing a broker to sell goods does not authorize him to sell in his own name."

In that case it was held that the purchaser from a broker had no authority to set off a debt against the broker, on the ground that the broker had no authority to sell in his own name. Brokers are defined to be " those who make contracts between merchants and tradesmen, in matters of money and merchandise, for which they have a fee." (1 Liv. on Agency, 73, ed. of 1818.)

It has been questioned among civilians, says Livermore, whether an authority to sell or let includes an authority to receive the price or not, and that Pothier says this power is not generally included. (Id., p. 74; Pothier's Traite des Obligations, 477.) But, that in some cases it will be presumed, as if goods are put into the hands of public brokers to be sold, and they are in the habit of receiving the price. Putting the goods in their hands implies an authority to

receive payment (2 Liv., 284, 285), as it does to receive payment on securities. (3 Chit. Com. Law, 207, 208.)

The general doctrine is, that a broker employed to sell has no authority as such to receive payment. (Russell on Fac. & Brokers, 48 Law Lib., 68–110; *Mynn* v. *Joliffe*, 1 Wood & Rob., 326; *Baring* v. *Corrie*, 2 B. & Ald., 137.) Exception is made to this general rule in some cases where the principal is not disclosed. (Smith's Mer. L., 129, by Hol. & Gholson), see, also, as throwing light upon this question, though not directly in point, *Whitbeck* v. *Waltham* (1 Sol.; 157); *Morris* v. *Cleasby* (1 Man. & Sel., 576.) Story says an agent to conclude a contract is not, of course, authorized to receive payment thereunder. (Story Ag., § 98, and cases there cited.)

Where the person contracting for the sale has the property in his possession, and delivers it, he is clothed with the *indicia* of authority to receive payment, especially when the owner is not known. Such are the cases referred to by the court below. He is then clothed with apparent authority, and that, as to third persons is the real authority. (*Cassel* v. *Thornton*, 3 Car. & P., 352; *Pickering* v. *Bush*, 15 East, 38.) In the latter case the property had been put into the possession of the broker and the title in his name. "The sale was made by a person who had all the *indicia* of property." (*Ireland* v. *Thompson*, 4 Com. Bench R., 149.)

*Cross* v. *Hasking* (13 Verm., 536): In this case, in the facts as stated, it does not distinctly appear; but it was so stated in the syllabus of the case by the reporter. (*Hasking* v. *Jones*, 3 Humph., 613.)

In the case at bar, however, the broker never had possession of the rye, and never delivered it; but the plaintiffs retained possession till they delivered to the defendant, and they were well known to the defendant; one of them had taken part in the negotiation for the sale, as owner, in the city of New York. The broker was simply authorized to make a contract for the sale. This was the whole of his authority in reality, and he had no other or further apparent authority.

Irrespective of the usage found by the referee, therefore,

the defendant, was not discharged by a payment to the broker.

· Does that usage discharge him? In other words, did the usage give the broker an authority to receive payment which otherwise did not belong to him? There is no authority in this State on this point, and none in principle, I think, that sustains the affirmative of such a position.

Mr. Justice Story, after referring to various cases of authority in agents to receive payment on bonds, &c., and whether before due or not, and to other cases, adds: "But if there be a known usage of trade, or course of business in a particular employment, or habit of dealing between the parties, extending the ordinary reach of the authority, that may well be held to give full validity to the act. (Story on Ag., §·98.) In another section he says: "Payments made to agents are good in all cases where the agent is authorized to receive them, either by express authority or by that resulting from the usage of trade, or from the particular dealings between the parties." (Id., § 249.) The authorities referred to are 2 B. & Ald., 137; 1 East, 36; and 1 M. & Sel., 576, 579, besides writers on agency.

· *Baring* v. *Corrie* (2 B. & Ald., 137), simply holds, that where the broker sells without disclosing his principal, he acts beyond his authority, and the buyer cannot set off a debt against the broker in answer to an action for the goods.

In *Foveus* v. *Bennet* (11 Cow., 86), it is true that Lord Ellenborough referred the case to a jury to find whether a payment made to a broker had been made according to the usage of trade. They found it had been. It was also referred to the jury to find what the words (in the bought and sold note given to each party) meant of "payment in a month, money." They found those words meant "payment at any time within a month."

In that case the brokers were entitled to receive payment, as they themselves made the delivery of the property, and were, therefore, intrusted with its possession. That confessedly gave them the right to receive payment. They were then factors. The question litigated there, was, whether the

broker had the right to receive the payment before the expi
ration of the month, not whether they had the right to
receive it at all. The interpretation of the words in the
notes settled that: a very proper office of usage. *Morris v.
Cleasby* (1 M. & S., 576), simply decides that, after the prin-
cipal is disclosed, a purchaser has no right to pay a factor for
the goods.

We are referred, by the counsel for the respondent, to
*Campbell* v. *Hopell* (1 Stark., 233), where no question of
usage of trade arose, except when the defendant offered to
show "that, by usage of the trade, a bill at two months, with
a discount, might be submitted for the original terms of a
bill at four months." But Lord ELLENBOROUGH refused to
hear any evidence to this effect, observing that it would be
productive of intolerable mischief to permit brokers to
deviate from the original terms of the contracts; and the
payment there made to the broker was held unauthorized,
and no defense to the purchaser.

In *Stewart* v. *Aberdeen* (4 Mees. & Wels., 218), the insur-
ance company had paid the agent, and it was held valid, on
the ground that the prior dealings between the parties had
authorized it.

In *Greaves* v. *Legg* (11 Exch., 642), a broker at Liverpool
had purchased a quantity of wool for merchants in London,
and the vendors gave to the broker notice of the vessels in
which they would ship it to the purchasers. It was proved
to have been the universal usage at Liverpool to give such
notice to the broker, and that it was his duty to communi-
cate it to the purchaser; held, a valid performance by the
sellers. That the notice thus given according to the usage
of trade was sufficient.

Authority to receive such a notice is of a very different
character and responsibility from an authority in a broker to
receive payment for goods.

Russell on Factors & Agents (48 Law Lib., 68), while he
denies the authority of a broker as such to receive payment,
adds that he may, "if the custom of trade or the usual
course of dealing between himself and his principal warrant

it;" and he cites *Baring* v. *Corrie* (2 B. & A., 137), before referred to, when the only point decided, as we have seen, was that a broker had no right to sell in his own name, and, of course, no right to receive payment. The duties and rights of the broker to contract for the sale of the grain were as clear and well defined in this case, as the duties and rights of a pledgee of stock, or of choses in action. The law defined them. It was no part of his duty to receive payment when the principal was known, and he never had possession of the rye. That was no part or branch of his assumed duty; which was simply to contract for a sale. There was nothing uncertain or obscure in the broker's legal duty that required or justified proof of usage to make certain or plain. It gave an addition — a clear addition to, not an explanation of his authority.

No usage is admissible to control the rules of law. In *Wheeler* v. *Newbold* (16 N. Y., 392), this court held that proof of usage of brokers in New York city to sell choses in action pledged to them in a mode unauthorized by law, was inadmissible. And so it has been held of stock pledged to brokers. (*Allen* v. *Dykers*, 7 Hill, 497; and see *Bowen* v. *Newell*, 4 Seld., 190; *Merchants' Bank* v. *Woodruff*, 6 Hill, 174.) So usage is not admissible to contradict the contract. (*Clark* v. *Baker*, 11 Metc., 186; *Blockett* v. *Assurance Co.*, 2 Tyrwh., 266.) In this case the law defined the rights and duties of this broker as clearly as it did those of the pledgee of stock in *Allen* v. *Dykers*, or of choses in action in *Bowen* v. *Newell*, and they could no more be controlled by usage.

Usages of merchants have been sparingly adopted by courts in this State, and in my opinion properly too. Mr. Justice STORY says they are often founded in mere mistake, and more often in the want of enlarged views of the full bearing of principles. (*Donnell* v. *Col. Ins. Co.*, 2 Sum., 377.) The usage as found, seems to me entirely unreasonable, and to uphold it, would be fraught with mischief. Brokers are thereby allowed to receive payment for principals living out of the city, and by implication, not for those residing in the city. Sound reason would seem to call for an opposite rule,

as city dealers might well be supposed to be well acquainted with the brokers, and to know who were worthy of trust; while country dealers would be very likely to share the fate of these plaintiffs. A grain broker, as the evidence shows, being quite likely to be without pecuniary responsibility. The purchaser need never incur risk, as he may learn the name of the principal and always pay him with safety.

In this case it would seem from the defendant's testimony, that this money was obtained from him, not under any usage but by the false pretense of the broker that the plaintiffs had drawn upon him for the proceeds of the rye and thereby impliedly authorized him to collect.

The judgment, I think, should be reversed and a new trial ordered, costs to abide the event.

WRIGHT, J. This judgment, I think, cannot be upheld. The referee finds that, in August, 1858, the plaintiffs sold to the defendant 3,426$\frac{2}{8}\frac{2}{8}$ bushels of rye at seventy-five cents per bushel, amounting in the aggregate to the sum of $2,567.77. The sale was effected through one Sayles, a grain broker, who, as such broker, was authorized by the plaintiffs to sell. At the time of making the sale the defendant did not know who was the owner of the rye, but before any part of the same was delivered he knew that the plaintiffs were the owners thereof; and, in fact, the rye was delivered directly to the defendant by the plaintiffs' bargemen, from the barge in which it was brought to the city. The delivery was on the 30th of August, and four days afterwards, upon the plaintiffs demanding the purchase price for the rye, the defendant refused to pay, assigning, as a reason for such refusal, that he had paid Sayles, the broker; and he never, in fact, paid them any part of the purchase-money. The referee found that, prior to the demand of payment by the plaintiff, the defendant paid to Sayles, the broker, the sum of $2,578.60 for the rye, being the purchase price; that there was a custom or usage of trade in the city of New York, when grain is sold by brokers, for the brokers to have the bill for the grain sold by them made out in the name of the brokers, and

for the brokers to collect the money for the grain sold from the purchaser, when the seller resides out of the city of New York, and that the defendant paid Sayles according to this usage, and is not indebted to the plaintiffs in any sum of money whatever, and is entitled to judgment. Judgment was accordingly given, dismissing the plaintiffs' complaint with costs.

The plaintiffs sold and actually delivered the rye in question to the defendant. They were not paid the purchase price; the defendant resisting payment on the ground that he had paid to a third party. This he could not lawfully do, unless the payment was to one authorized to receive the money for the plaintiffs. Sayles, the party to whom the money was paid to, was not so authorized. It is found by the referee that his sole authority was to *sell*, and that simply *as broker*. This did not include or embrace any right to receive the price, where, as in this case, the principal was known. It is a well settled rule of law that an authority to a broker to *sell* does not authorize him to sell in his own name, or receive the price when the principal is known to the purchaser. The authority to sell gave Sayles no right to treat the rye as his own property, make out a bill therefor in his own name, collect the money or receipt for its payment. He was employed to sell the particular cargo of grain, as a broker, and a sale being made, his duty, office and function was at an end. A broker for sale is a mere negotiator or middle man between the seller and purchaser. His duty, in general, is ended and he has fulfilled his contract when he has found a purchaser and brought the parties together; and is then entitled to his commissions, whether the property is actually delivered and money paid or not. As a broker for sale, then, Sayles had no authority to receive payment; and a payment made to him was not a payment to the plaintiffs; nor did it operate to discharge the defendant from liability to the latter. A principal is only bound by the authorized acts of his agent. Sayles was the special agent of the plaintiffs to sell merely — indeed, a broker, as such, is never but a special agent — and whoever deals with an agent constituted

for a special purpose deals at his peril when the agent passes the precise limits of his power.

But the referee rested his judgment solely upon a custom or usage which he found to exist in the city of New York, that when grain is sold by a broker, for the broker to have the bill for grain sold by him made out in his own name, and for him to collect the money from the purchaser where the seller resides out of the city of New York. The plaintiffs resided in the city of Albany, and the defendant, having paid Sayles, in accordance with this usage, for the rye, was given judgment.

It is obvious that the rights of the plaintiffs cannot be controlled or affected by a local usage in a particular trade, found by the referee. The usage is invalid, and has no binding force upon the plaintiffs, for various reasons. It being the law of the State, that a broker in general (and that is all that Sayles was in this case), has no authority to sell in his own name, and therefore no authority to receive payment for goods sold by him, a local custom like that found by the referee to exist in the city of New York was void. Such a usage, if sanctioned, would be to overthrow the law in the city of New York. If it prevails there, as the referee has found, it cannot be allowed to control the settled and acknowledged law of the State. Again, the pretended usage is void, as not general, being confined to certain persons in New York, unreasonable and against public policy. This view of it is well put by the dissenting judge in the court below. " The proposition," he says, " that persons engaged in a particular trade at a particular place, can, by the custom or usage adopted and regulated by themselves, create a power beyond what is actually conferred, or necessarily implied, depriving an owner of his property, the possession of which he had not parted with, seems to me so fraught with mischief, as well as unsoundness, as to require only its announcement to meet with repudiation." But, finally, the usage being local, its existence must be clearly proved to have been known to the plaintiffs at the time. This is not found by the referee, and so far from its being the fact, the

plaintiffs showed affirmatively that they understood the usage to be precisely the reverse. So that the usage, if valid (which I think it is not), did not bind the plaintiffs.

I am for a reversal of the judgment.

Judgment reversed.