OSCAR L. RICHARD and Others, Doing Business under the Name of C. B. RICHARD & Co., Plaintiffs, v. CREDIT SUISSE, Defendant.

Supreme Court, New York Special Term, June 13, 1924.

Banks and banking — motion for summary judgment granted in action to recover amount paid defendant bank in 1920 on contracts for purchase of Polish marks for delivery at Warsaw — agreement to purchase arose from interchange of cablegrams between plaintiffs in New York and defendant in Switzerland by which plaintiffs cabled acceptances of offers of defendant — failure of defendant to justify denials in answer as to allegations of payment — plaintiffs' affidavits sufficient to establish payments under contracts — execution of contracts admitted by defendant — plaintiffs entitled to rescind contracts where time for performance had long passed — parties did not impliedly assent to custom, usage and practice of " the law merchant " casting obligation on plaintiffs to see defendant had performed — defendant obligated to deliver marks at Warsaw — fore gn statute inapplicable as to avoidance of defendant's obligation to deliver marks at Warsaw as contemplated by parties.

In an action to recover amounts aggregating $74,157.60, paid defendant banking house in 1920, under three contracts for' the purchase of Polish marks to be delivered at Warsaw, plaintiffs' motion for summary judgment should be granted since an examination of defendant's affidavits on the motion does not disclose any justification for the denials in its answer as to plaintiffs' allegations of payment of the amounts involved under the respective contracts, and since it appears that the contracts, the execution of which is admitted by the defendant, arose out of cablegrams exchanged between the plaintiffs in New York and the defendant in Switzerland, by which the plaintiffs cabled acceptances of offers made by the defendant; that plaintiffs, finding the defendant had failed to deliver the marks at Warsaw, rescinded the contracts and sued on the theory of rescission for the total non-performance of the contracts; and that plaintiffs' affidavits are sufficient to establish the payments alleged.

Plaintiffs were entitled to rescind without giving the defendant further opportunity to perform, since the time for performance had long passed, with the plaintiffs resting in the belief that there had been performance, and since the contracts related to purchases of foreign exchange by cable.

The plaintiffs were not bound by an alleged custom, usage and practice of " the law merchant " and " international banking " to follow up the defendant to ascertain whether it had made a delivery of the marks at Warsaw, since defendant's obligation under the contracts was to deliver the marks at Warsaw and there is nothing to show that the parties impliedly assented to the custom. Moreover, the custom, if allowed, is inconsistent with the legal effect of the contracts and would tend to permit the defendant to import into them new terms and conditions, or vary the legal effect of the transactions.

Defendant's position that though performance of the contracts be no longer possible, a notice to the defendant was necessary to bring about a condition of default, and that plaintiffs are not entitled to rescind and invoke their legal remedies, is inapplicable, since it appears to be predicated upon a foreign statute which would allow the defendant to avoid its liabilities and repudiate its obligations. This would be a departure from the justice of the case itself

as well as from established principles of legal justice based upon the concept of the obligations and the rights of the parties prevailing in this State under decisions of our courts.

MOTION by plaintiff for summary judgment.

*Weschler & Kohn* [*J. Charles Weschler* of counsel], for the plaintiffs.

*Henry Escher*, for the defendant.

GAVEGAN, J.:

This is a motion for summary judgment. The action is to recover, on the theory of rescission, for total non-performance on defendant's part, amounts totaling $74,157.60, paid between the middle of May and July 1, 1920, by plaintiffs, copartners doing business at New York, to defendant, a banking house in Switzerland; such total being what they contracted to pay it for three purchases of Polish marks to be delivered at Warsaw. In accordance with the agreement of the parties, one of the payments totaling such sum was made by a foreign credit in francs. Plaintiffs in each of their three counts refer to a contract between the parties. By the first contract, according to plaintiff's allegations, defendant agreed, for $48,000, to sell them " 10,000,000 Polish marks and to pay the same forthwith, for the account of the plaintiffs, to Stanislas Lesser, a banker at Warsaw, Poland." In their second count plaintiffs allege defendant agreed, for $10,800, to sell them " 2,000,000 Polish marks, and to deliver and transmit the same forthwith for the account of the plaintiffs to the Commerzbank at Warsaw, Poland." By the third contract plaintiffs allege defendant agreed, for 78,000 Swiss francs, valued as of July 1, 1920, to sell them " 2,000,000 Polish marks, and to deliver and transmit the same forthwith for the account of the plaintiffs to the Commerzbank at Warsaw, Poland." It is alleged that said francs were on the day stated of the value of $15,357.60.

As to the contract referred to in the first cause of action, the amended answer admits that defendant " agreed, in consideration of the sum of " $48,000, " to sell to plaintiffs 10,000,000 Polish marks, * * * and to pay the same for the account of the plaintiffs to Stanislas Lesser, a banker of Warsaw, Poland." Lesser was plaintiffs' designee. Referring to plaintiffs' allegations in their second cause, defendant admits in the amended answer that it " agreed, in consideration of the sum of $10,800, to sell to the plaintiffs 2,000,000 Polish marks, * * * and to transmit the same for the account of the plaintiffs to the Commerzbank at Warsaw, Poland." In relation to the third contract declared on by plaintiffs, the amended answer admits that defendant " agreed, in consideration of the sum of 78,000 Swiss francs, * * * to

sell to the plaintiffs 2,000,000 Polish marks, * * * and to transmit the same for the account of the plaintiffs to Commerzbank at Warsaw, Poland."

The agreements arose out of messages exchanged between the parties, some of which will be set out below. That contracts were so made is admitted. There are before the court correspondence and facts from which defendant's obligations may be determined. Certain allegations contained in the complaint are denied in the answer. So far as these denials relate to material facts they are untrue. Indeed, it is indicated by the briefs for defendant that the denials are intended to be merely formal, its counsel conceiving that they are necessary to the subsequent statement of defenses. Defendant denies that it failed to perform the contracts, but the denials in this respect are based upon false contentions as to the obligations which the contracts respectively require defendant to perform.

As to the facts, the furthest it urges its denials of plaintiffs' allegations that it failed to perform is to indicate that it does not know whether Lesser was paid or not. But it completely fails to throw any doubt on plaintiffs' evidence that he was not paid. There is an intimation that the Commerzbank at Warsaw, though having to some extent at least carried out defendant's instructions, and though having to such extent completed performance on behalf of defendant, has, in order to assist plaintiffs, endeavored to make it appear that it did not open the credits to plaintiffs or their designee, as it was directed by defendant to do. But the documentary proof produced by plaintiffs, consisting in part of communications originating with defendant itself, shows that there is no warrant in fact for any such suggestion, and shows that defendant wholly failed to perform under all three contracts An example of such communications from defendant is its message of April 1, 1921, to the Commerzbank, wherein it says: " You debited us July 20 for payment to Stanislas Lesser, and if this payment could not be effected you should have informed us immediately, and not after eight months only."

That defendant did not cause payment to be made to Lesser, who liquidated at the end of 1920, is further shown by the amended answer in its 21st paragraph, where it is alleged that after March, 1921, the Commerzbank credited the 10,000,000 marks to the account of plaintiffs. This was a credit which plaintiffs refused to accept at about the time they demanded back their money. It is shown beyond peradventure that plaintiffs received nothing for their payment to defendant pursuant to any of the contracts. It is also denied that plaintiffs made the payments which the contracts

Supreme Court, June, 1924.          [Vol. 124

required them to make. That these denials are untrue is shown by the correspondence and various communications between the parties.

Plaintiffs' affidavits establish the payments, and there is no basis in fact indicated by defendant to justify the denials relating to the respective payments by plaintiffs of consideration under the contracts. Payment of the price under at least one of the contracts is shown by a communication from defendant itself. It also denies the value of Swiss francs paid by plaintiffs as of the date of payment. This is a denial of knowledge or information sufficient to form a belief. But, though defendant is a Swiss bank, no averments are found to meet those of plaintiffs establishing the value of that payment expressed in American money. There are some other denials; but they should be disregarded without further comment, being obviously false. In the first brief for defendant it is stated that: " The elaborate discussion in the moving papers regarding the effect of the denials need not be discussed because they are to be read in connection with the separate defenses which follow. If these defenses are good, the denials are justified and necessary to raise the issue properly."

The affidavits in opposition to the motion are made by defendant's attorney. This is not because there has not been ample opportunity to obtain affidavits from officers of the defendant bank. Further time to obtain evidence from abroad is not sought. Indeed, in the verification of the amended answer, defendant's attorney avers that the sources of his information " are an examination of the pleadings and correspondence herein; that the entire case arose out of such correspondence, and not from personal interviews or transactions with third persons; that deponent has interviewed the officers and representatives of the bank personally in Zurich during the year 1923." The material correspondence is now before the court.

In the second affidavit filed in opposition to the motion, also verified by defendant's attorney, reference is made to the charge that defendant's officers are unwilling to make affidavits, and it is averred: " The explanation for the situation is  *  *  * that the whole transaction, as Richards deposes, is contained in letters and cables; it would have been an idle ceremony to have forwarded the original affidavits to Europe for signature, when they could be signed here."

Plaintiffs' theory is that of rescission. They want their money back because defendant wholly failed to perform. Though admitting that the contracts were made, defendant does not agree with plaintiffs that two of them were made in New York city. One

was admittedly made in Switzerland. While it is my view that plaintiffs are entitled to judgment, regardless of where the contracts were actually made, I will indicate my reasons for believing that the contracts pleaded in the first and second counts were made in New York when plaintiffs there sent acceptances of defendant's offers. The discussion in that respect will throw light on the position of defendant generally, and will at the same time lead to a clearer understanding of some of the underlying facts. All of the contracts resulted from the interchange of cablegrams. That pleaded in the first count arose out of two such messages. Defendant's was sent on May 14, 1920, from Zurich to plaintiffs at New York. It read: " 9514. Please sell best other tenmillion Warsaw wire rate urgent." To this plaintiffs answered from New York: " Urgent Credit Swisse Zurich accept tenmillion Warsaw 48 Pay Stanislas Lesser." Referring to those two communications, defendant on May 18, 1920, wrote to plaintiffs that " cables exchanged between us on May 14th and 15th resulted in our sale to you of vol M. 10,000,000 payment to Stanislas Lesser." In spite of this statement from defendant that the cables " resulted in our sale," and though admitting a contract, defendant contends that its offer was not accepted as made, and that there was no contract until defendant assented to the changes in terms, which it finds to be indicated by plaintiffs' cablegram. Just when such assent was given, so as to make the contract, as defendant would have it, is not clear. Apparently, for this, defendant does not rely upon its letter of May 18, 1920. It had already taken steps looking toward performance when that letter was written, having sent a communication on May 17, 1920, directing that the credit be opened to Lesser.

Furthermore, if defendant relies on its letter of May 18, 1920, in this respect, there could be no contract until the receipt of such letter in New York; for the letter was not a means of communication contemplated by the previous messages relating to that transaction. They were cablegrams, and cannot be taken as authorizing an acceptance by letter. Moreover, the evidence before the court establishes it to be a fact that, when seeking to make contracts, the parties communicated by cable. The greatest possible speed was demanded by the character of the subject-matter of their dealings. As the agreement contemplated immediate delivery, there would, were defendant's arguments acceptable, be no contract until after its instructions of May seventeenth should have, in regular course, resulted in performance on its part. These contentions of defendant are referred to principally because they bring out the insincerity of its position.

In reference to the first count, an asserted variation from the terms of the offer, asserted by defendant to have been made by plaintiffs, is the direction contained in plaintiffs' telegram to " pay Stanislas Lesser." But that direction purports to and did add nothing to the obligation which the defendant by its message had offered to sell. The answer from plaintiffs was an acceptance of the offer to deliver the marks at Warsaw. They accepted the offer as made, and defendant became obligated to make delivery at Warsaw. They might then or later indicate a designee to accept the local currency. By naming him in the communication by which they accepted the offer, they did not refer to an obligation varying in the slightest from that which defendant had offered to sell them.

It is not contended that the language " best other tenmillion " left anything indefinite and uncertain between these parties. The word " best " referred to current prices, and it was used in a meaning thoroughly understood between the parties. " Other " and " tenmillion " merely meant another 10,000,000. In the original briefs for defendant it was argued, substantially, that the words " please sell," used in its said message, referred to an authorization to sell to others, and not to a purchase by plaintiffs, and that there was not an offer which could be accepted by plaintiffs. The court called for further affidavits in relation to this, with the result that plaintiffs made proof of a great many instances in which the same language had been used, in making offers to sell to plaintiffs, and with the result that defendant now concedes that the cablegram was an offer to sell to plaintiffs directly.

In relation to the contract pleaded in the second count, the initial telegram from defendant to plaintiffs reads: " 9401  Sell best two million Warsaw limit 54." To which the plaintiffs replied by cable: " Tuesday accept two million Commerzbank Warsaw 54." This communication embraced other matters not pertinent to a discussion of the second cause of action. It is now conceded that the message 9401 was an offer to sell directly to plaintiffs. Referring to this interchange of communications which occurred about June 1, 1920, defendant wrote plaintiffs on August 2, 1920: " We beg to confirm our exchange of cables of May 28th, June 1st, from which resulted our sale to you of Pol. Mks. 2,000,000 — payment to the Commerzbank at Warsaw at .54."

This letter referred to other items of the same period, May twenty-eighth to June first, and continued: " Making at aforementioned rates $10,800, * * * for which amounts you have credited us in Nostro. Owing to a confusion brought about by various transactions with you at above stated period, we over-

looked to confirm these sales to you until now, which delay you will kindly excuse."

Apparently defendant would argue that the second contract was not made until receipt by plaintiffs of its said letter of August 2, 1920, after it had been paid the consideration, long after it had sent the Commerzbank at Warsaw directions to perform on plaintiffs' behalf, and long after the time for performance had passed; for defendant contends that the designation by plaintiffs of the Commerzbank was a new term not contemplated by the offer. The facts stated indicate the absurdity of this. On occasions when defendant conceived that a cablegram from plaintiffs was an offer, and not an acceptance of an offer previously made by defendant to plaintiffs, we find it promptly wiring back the answer necessary to make a contract. The communications which, according to the statements of defendant itself, resulted in the contracts respectively referred to in the first and second counts, were not supplemented by additional cablegrams from defendant. In each of those two instances it proceeded to perform its obligations under the contracts entered into without first communicating further with plaintiffs.

As stated above, all the facts show that those two contracts resulted from acceptance by plaintiffs of defendant's offers, in the method thereby authorized, and there is no fact to even suggest any other conclusion. Not until well along in the year 1921 did plaintiffs discover that these three contracts remained unperformed. They had a great many dealings of the same character with defendant and others. After it developed that they were short of marks at Warsaw, they sent a representative to that city to make an investigation on the ground. This resulted in it being definitely ascertained that defendant had failed to perform the three contracts referred to in the complaint. Thereupon plaintiffs demanded their money back and about this time defendants made some lame efforts to tender performance.

It advances the argument that, under the law of the State of New York, there could not have been a rescission until it had been given a further opportunity to perform. But the doctrine of *Taylor* v. *Goelet* (208 N. Y. 253), on which it relies, never applied to a situation like this, where the time for performance of the contractual obligation had long passed, with the parties resting in the belief that there had been performance. That case contemplated a situation where the promisor had been lulled into the belief that, by mutual, though tacit, consent, prompt performance had been waived, or the time for performance had been extended, and would not be terminated without giving him a

reasonable opportunity to complete. Furthermore the Court of Appeals, in *Trainor Co.* v. *Amsinck & Co., Inc.* (236 N. Y. 392) stated (at p. 395) that the rule in *Taylor* v. *Goelet* (*supra*) " does not apply to cases requiring the delivery of articles of speculative and fluctuating value. We have held it does not apply to contracts relating to cable transfers of exchange."

So far as the defenses set up in the amended answer are worthy of any consideration, they set up foreign law and an alleged custom, usage and practice of " the law merchant " and of " international banking." In accordance with such custom and usage it is alleged that plaintiffs had a duty to follow up defendant, or at least to inquire and ascertain whether defendant had made delivery of the marks at Warsaw. Though not clearly alleged, it is apparently also intended to be alleged that plaintiffs had the duty of notifying defendant should it fail to deliver as contemplated by the parties. Assuming that the duty to follow up was imposed on plaintiffs by usage and custom, it may have been that, had they complied with such obligation, the failure of the bank at Warsaw to accomplish performance of the contracts, in accordance with defendant's directions, would have been promptly discovered; and it is shown that marks retained their value — indeed, increased in value — during at least six weeks following the period in which the contracts were made. If plaintiffs had that duty, there would be a question as to whether they have performed on their part or as to whether their own negligence resulted in the present situation. They have received nothing, and, when the shortage referred to was traced to defendant and when it tendered performance, the marks contracted for had but a fraction of their values as of the times plaintiffs paid for them. But defendant's obligation was to deliver in Warsaw, and there is no ground here for a finding that the parties impliedly assented to the application of such a custom. There is nothing to show that each side knew the other believed there was such usage, or that it was understood plaintiffs were under a duty to follow up defendant in the performance of its obligations.

Furthermore, to have the effect defendant would give it, the custom must not only be actually or constructively known. It must be consistent with the contracts. It is inherently inconsistent to say that defendant is relieved of the unqualified duty to deliver, as imposed by the contracts, unless plaintiffs follow it up. Their obligation was to pay the price, and that is all they agreed to do. The custom pleaded would cast on them an obligation to see that defendant performed, and at the same time relieved it from responsibility for its non-performance, should such non-performance

be accompanied by plaintiffs' failure to promptly follow up defendant. It would most substantially alter the obligations subsisting between the parties, as defined in the numerous cases relating to foreign exchange which have gone through our courts in the last few years. They show that plaintiffs were required by each of the contracts, merely to pay their money, and that defendant was required to deliver the foreign money at the specified place where it was current, in the manner contemplated by the parties.

A custom or usage may be resorted to for the purpose of explaining a contract, to clear away ambiguity, to amplify terms, if necessary to a statement of the intention of the parties, but not to alter the obligations between the parties resulting as the legal effect of their agreement. Defendant may not resort to custom to cut down its undertakings, to shift to plaintiffs part of the burden of the obligations which it sold to them. In *Ford* v. *Snook* (205 App. Div. 194, 197) it is said: " The plaintiffs have sought to change by proof of such custom the intrinsic character of the original contract between the parties. This may not be done."

In *Hart* v. *Cort* (165 App. Div. 58 ', 584) it is said: " That custom may not be shown to contradict the express terms of a contract is conceded. Is it competent to contradict those terms which attach to it by implication of law? I think, both on principle and authority, this question must be answered in the negative. * * * In *Hopper* v. *Sage* (112 N. Y. 530) there was a contract for the sale in futuro of shares of corporate stock, on which a dividend had been declared prior to the date of the contract, but which dividend was not payable and was not paid until after such date. The contract provided that the defendant (purchaser) ' is entitled to all dividends or extra dividends declared ' between the date of the contract and the day when the stock was to be delivered, but was silent as to dividends declared before the contract was made. Defendant laid claim to the dividend in question, and in support of such claim offered evidence of a custom of the Stock Exchange, but the court held that the contract was not ' made under such circumstances that those rules * * * could have any legal effect * * *; so far as the case shows, he (the vendor) was not a member ' of the Exchange. Perhaps the decision of the case might well have been put solely on this ground, but it was not. After referring to the rule of law which gives to the owner of shares all dividends declared during the period of such ownership, the court, per PECKHAM, J., said: ' Usage and custom cannot be proved to contravene a rule of law or to alter or contradict the express or implied terms of a contract free from ambiguity, or to make the legal rights or liabilities of the parties to a contract other than

they are by the terms thereof. * * * ' In the earlier case of *Higgins* v. *Moore* (34 N. Y. 417) the same learned judge who wrote for the court in *Hopper* v. *Sage* (*supra*) in an opinion reviewing many cases, clearly expressed and unmistakably applied the principle upheld in the latter case. That custom may not be invoked to alter or impeach the ' implied terms of a contract, or to make the legal rights or liabilities of the parties * * * other than they are by the common law,' was expressly said by EARL, C., writing for the court, in *Bradley* v. *Wheeler* (44 N. Y. 495, 504), which is among the cases cited and relied on in *Hopper* v. *Sage* (*supra*). In *Lawrence* v. *Maxwell* (53 N. Y. 19) the court, per ALLEN, J., said (p. 21): ' The counsel for the appellant does not controvert the elementary principle that custom or usage cannot avail to vary or alter the terms of 'an agreement as made, or its legal effect. Evidence may be given of a custom or usage in explanation and application of particular words or phrases, and to aid in the interpretation of the contract, but not to derogate from the rights of the parties, or to import into the contract new terms and conditions, or vary the legal effect of the transaction.' "

In *O'Donohue* v. *Leggett* (134 N. Y. 40, 44) it is said: " The custom, if allowed, and of the force suggested, would in effect alter the contract in a particular material to the rights of the defendants. Evidence of it was, therefore, properly excluded."

So here the effect of the alleged custom, as defendant would have it apply, would be inconsistent with the legal effect of the contracts, and would alter them " in a particular material to the rights " of the plaintiffs. Defendant would resort to it " to import into the contract new terms and conditions " and " to vary the legal effect of the transaction."

Respectively directed to the several counts of the complaint, the amended answer also contains defenses based upon foreign law. So far as the foreign law pleaded even suggests an adequate defense, it is found in Code provisions to the following effect: " A right to rescind is always understood in bilateral contracts in the case where one of the parties does not fulfill his obligations." In this case the contract is not rescinded as a matter of right; the party in whose favor the obligation has not been executed has the choice either to compel the other party to carry out the latter's obligation where that is possible, or to demand resciss'on of the contract, damages and interest. " Rescission must be demanded by legal proceedings and there may be accorded to the defendant time to complete according to the circumstances." " If performance under a contract is due, the debtor is put into default through notice from the creditor."

Apparently these Code sections relate to the remedy and would have no application here; for as to the remedy we must look to the law of the forum. Notice such as is required in those sections refers to a step in the process of remedy. In this respect defendant's position is that, though the time had long expired within which, allowing the greatest possible latitude, there could have been performance, when the shortage of marks was traced to defendant's failure to carry out its obligations under these three contracts, the promisees could not proceed with their remedy until they had given the promisor a notice as well as further opportunity to deliver the marks.

Overlooking the obvious inconsistency implied in the suggestion that there should have been allowed further time to do what could no longer be done, because of the expiration of the time within which it might have been accomplished, it is apparent that the most defendant might work out of the foreign statutes pleaded is that they require a preliminary step by a promisee seeking to get back what he paid to a promisor who has wholly failed to perform the promise. If with defendant we read the foreign law as meaning that, though performance be no longer possible, a notice is necessary to bring about a condition of default prerequisite to resort to remedies in Polish tribunals, we do not change the fact that, when plaintiffs sought to get back their money, defendants had wholly failed to perform and the time had elapsed within which it might have performed. There existed a situation which entitled plaintiffs to invoke their legal remedies. In the forum where they have proceeded there are no preliminary steps required, in the remedial legal processes, such as defendant would spell out from the foreign code. But, in any event, the foreign law pleaded is on its face inapplicable to the situation which confronted plaintiffs when the failure of defendant to perform the three contracts was definitely ascertained in 1921. It was then no longer possible to " complete " either " according to the circumstances " or otherwise.

Furthermore, in that situation there could be no occasion to put defendant in default. Its default had become irretrievable. We have not a case where lapse of time spells merely delay. The nature of the transactions, the " urgent " communications by cablegram, and all elements relating to or which might explain the business in hand show that there had been a lapse of time beyond the period within which the parties intended it to be possible to perform. It is idle to assert that by the foreign law there could be no default without further notice, when the facts are consistent with no finding but that of default. It was no longer possible to render to plaintiffs that for which they paid defendant, for it had

Supreme Court, June, 1924.    [Vol. 124

allowed so much time to go by that the essential conditions of performance plainly existing here could no longer be met. Cablegrams were resorted to because speed was of the essence in the transactions. In one instance haste was expressly required by the use of the word " urgent." What the parties contemplated could not be accomplished without promptness and speed. They intended immediate delivery at Warsaw.

No other conclusion can be drawn when we consider their own expressions, the methods resorted to for quick interchange of messages, and the mercurial nature of such transactions as these in times when, as asserted by defendant, turmoil, invasion and war existed or were threatened at the place of performance. Consistently with the intentions of the parties, the deliveries could not be consummated nine or ten months after the contracts were made. No foreign law is pleaded, the effect of which would be to make defendant's obligation under any of the contracts other than to deliver at Warsaw as contemplated by the parties.

We must reject the suggestion that the obligation of prompt performance may be avoided by reason of code provisions in effect at Warsaw. The result of that would be to allow defendant to avoid its liabilities arising out of complete failure to perform on its part, in May or June, 1920, by paying off plaintiffs in the depreciated Polish currency of 1921. Its position in this respect is in harmony with that taken by dealers in foreign exchange, but uniformly rejected by our courts, in the litigations which have been so numerous here of recent years.

Defendant's position, which it seeks to support by reference to foreign statutes, amounts to repudiation of its obligations. Its argument suggests that we reject the principles of law, applicable to transactions of this character, repeatedly stated and defined by the courts of our State. To sustain defendant in this respect would be to depart from the justice of the case itself as well as from established principles of legal justice based on the concept of the obligations and the rights of the parties prevailing here under the decisions of our appellate courts. As indicated, there have been pleaded no provisions of foreign law which suggest that plaintiffs may not recover moneys paid to defendant for the accomplishment of what they have wholly failed to do.

Defendant does further plead that it performed by using the customary means and by sending to the Warsaw bank its directions which should have resulted in the credits being opened. In the opposing affidavit verified January 29, 1924, it is averred that defendant's whole duty was complied with when it ordered the necessary credits passed at Warsaw. This is illuminative of its

MATTER OF PRESSPRICH. **15**

Misc. 15]     Surrogate's Court, New York County, November, 1924.

position, which is untenable. Plaintiffs bought something from defendant which it never gave them. They did not employ defendant to give instructions.

The motion for summary judgment will be granted as to all the causes of action. Settle order on notice.